593 So.2d 753 (1992)
STATE of Louisiana
v.
Lawrence WILLIAMS.
No. 91-KA-346.
Court of Appeal of Louisiana, Fifth Circuit.
January 15, 1992.
*754 Ginger Berrigan, Jefferson Parish Indigent Defender Program, Gretna, for appellant Lawrence Williams.
Louise Korns, of counsel; Office of the Dist. Atty., Gretna, for the State.
Before GAUDIN and DUFRESNE, JJ., and FINK, J. Pro Tem.
ELORA C. FINK, Judge Pro Tem.
Lawrence Williams appeals his February 28, 1991 conviction of attempted illegal possession of stolen things valued at $99.00, a violation of LSA-R.S. 14:27 and 14:69. He was sentenced to serve three months in parish prison, with execution of the sentence suspended, and was placed on inactive probation for six months. In addition, he was ordered to pay court costs and a $100.00 fine. He filed a motion for appeal on March 1, 1991.[1]
*755 We affirm the conviction, for the reasons that follow.

FACTS
Dan Salzer, general manager of Gallo Wine Company of Louisiana, Inc., testified Lawrence Williams had been employed by his company for 19 years as a day warehouseman. On June 13, 1990 the defendant had been working for about a week as temporary night supervisor because the permanent supervisor had been injured. As supervisor Williams was in charge of loading trucks, a job which involves security and accuracy, and was entrusted with the keys to the warehouse. Those included a shunt key that operates a switch to disengage the alarm system. The supervisor is responsible for leaving the shunt switch in an open position so that he will be notified by the ringing of a loud bell if anyone attempts to leave the building.
Salzer testified further that he and Jimmy Band, the warehouse manager, set up a surveillance in the office building across from the warehouse at about 12:15 on the morning of June 13th. They had been notified that morning by the cleaning crew that people were taking wine out of the warehouse and transporting it out by automobile.
At approximately ten minutes to 1:00, they heard the alarm system go off, indicating somebody was operating the outer door. They observed Derrick Sterling, a temporary employee, exit the warehouse holding a four-pack of wine coolers. Sterling reentered the building and exited again carrying two rolls of toilet paper. The alarm sounded again, but there was no sign of Lawrence Williams coming out to check on why the alarm was going off. Sterling then left the premises.
At about 1:10 a.m., employee Erskine Moore came out through the same door carrying two cases of wine from the Gallo inventory, but the alarm did not sound. Moore put the wine in the trunk of a car belonging to Ronnie Jones, another employee. This was the only car left on the premises. When Moore opened the trunk, Salzer saw four more cases of wine already in there. Moore then reentered the warehouse and came out again carrying another case of wine, which he put in the back seat of the car directly behind the driver's seat. Moore then return to the warehouse. Through all of Moore's exits and re-entrances, there was no sound from the alarm bell.
Then Moore and Jones exited while Williams set the night alarm. Williams then proceeded out to join the others in Jones' car. Jones sat in the driver's seat, the defendant sat in the front passenger seat, and Moore sat in the back behind the defendant. Salzer stated there was a case of alcohol in the back seat, next to Moore and directly behind the driver. He stated the men waited in the car a couple of minutes, which he assumed was to hear the alarm sound to indicate the night security system had been turned on.
Salzer, who had already called the police, went out to the car to detain the suspects until the police arrived. Lawrence Williams got out of the car with his hand extended to shake Salzer's hand. As he stood up more than a dozen plastic wastebasket liners fell from his lap to the ground. Salzer informed him they were being detained for the police. He said none of the three offered any resistance.
When the police arrived they took custody of Moore and Jones. The defendant was arrested at a later date. The value of the wine was established through Gallo inventory lists, which showed the price of the wine was $20.40 per case. Photographs taken on the scene showed there were seven cases of wine and a bottle of pink champagne in the car.
On cross-examination, Salzer testified he had made Williams temporary supervisor *756 because he had considered him a trustworthy employee and he admitted Williams had no formal training in operating the different alarm systems, only on-the-job training. He said that Sterling, Moore, Jones and Williams were the only employees working that night and Williams was the only one with a key to the shunt switch.
Salzer testified further that the area where the trucks are loaded is noisy when the conveyor system is operating, but pointed out that the truck-loading had been finished before the incident he and Band observed. Salzer admitted he never saw the defendant himself carry out any wine or physically assist anyone to carry out wine and that Williams did not look in the trunk or in the back seat when he got into the car.
The testimony of James Band, the warehouse and delivery manager for Gallo, was the same as Salzer's. In addition, Band noted that the alarms are supposed to remain activated on both doors leading out of the warehouse until time for the night shift to leave. He admitted that he could not see the loading area from the surveillance position and that he did not know where the defendant was during the transfer of the wine from the warehouse to the car. He also admitted, that he never saw the defendant carry out any wine, either by himself or by helping others.
Testifying in his own defense, Williams stated he had been with the company for 19 years and had never had problems with the law nor been convicted of any crimes. He testified he had been provided with no training for the supervisor's position, but had learned the job by watching the previous supervisor. He said he had not really wanted the position, but had to fill in until they could get someone.
The defendant testified he got into Jones' car because Jones had been giving him a ride to the bus stop during the week he worked as night supervisor. He denied stealing any wine and he denied he knew anyone was stealing wine.
On cross-examination, Williams stated this was the first time in his employment history that he had access to a shunt switch key. According to him when they were getting ready to close up at about 1:45 a.m. he had to turn off the shunt switch to make sure the building was locked, as well as go into the truck yard to check the trucks to make sure they were also locked. He testified further that he took the garbage can liners because they were old, wrinkled and dirty; he said he had permission from another employee who was there earlier.
Williams denied seeing the case of wine in the back seat of the car. He testified the interior light in Jones' car did not work and that he had only just sat down in the car when Salzer confronted the passengers and had not looked in the back seat. He also asserted that Jones told the police that Williams was not "with" them.
On rebuttal, the prosecution recalled Salzer to the stand. Salzer stated that the garbage bags that fell out of the defendant's lap were new and there were about a dozen and a half. After this testimony, the prosecution and the defense stipulated that the trash bags were not mentioned in the police report or in any of the statements taken by the police.
In rendering his verdict at the conclusion of trial, the judge made the following statement:
The Court finds the State has proved beyond a reasonable doubt the defendant participated in this crime. Particularly, the fact that there was only one key available to shunt out the alarm system. And the alarm system was conveniently off at the time the wine is removed from the building. So, the Court finds that the State has borne its burden of proof, and finds the defendant guilty.

LAW
The sole issue on appeal is whether the evidence was sufficient to support the conviction. The defendant argues the State failed to establish that he "attempted to possess, procure, receive or conceal that wine, much less that he did so knowing or having good reason to know it was stolen."
*757 The standard for determining sufficiency of the evidence was discussed in State v. Burrow, 565 So.2d 972, 976 (La.App. 5 Cir. 1990), writ denied, 572 So.2d 60 (La.1991):
The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965 (La.1986); State v. Davis, 540 So.2d 600 ([La.App.] 5th Cir. 1989). When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The requirement of LSA-R.S. 15:438 does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. State v. Captville, 448 So.2d 676 (La.1984); State v. DiLosa, 529 So.2d 14 ([La.App.] 5th Cir.1988), writ denied, 538 So.2d 1010 (La.1989). Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Porretto, 468 So.2d 1142 (La. 1985), dissenting opinion, 475 So.2d 314 (La.1985). [Emphasis added.]
Illegal possession of stolen things is defined in LSA-R.S. 14:69:
A. Illegal possession of stolen things is the intentional possessing, procuring, receiving, or concealing of anything of value which has been the subject of any robbery or theft, under circumstances which indicate that the offender knew or had good reason to believe that the thing was the subject of one of these offenses. [Emphasis added.].
An attempt to commit a crime is defined by LSA-R.S. 14:27 as follows:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
The specific intent to commit a crime is an element of an attempted offense. Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10. Thus, in order to convict for an attempted offense, there must be sufficient proof "that the offender actually desired to cause the proscribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object." LSA-R.S. 14:10; State v. Volkmann, 539 So.2d 1279 (La.App. 3 Cir.1989); State v. Hunter, 454 So.2d 131 (La.App. 2 Cir.1984), writ denied, 456 So.2d 1018 (La.1984).
Specific intent is a state of mind. As such, it need not be proven as a fact but may be inferred from the circumstances and actions of the accused. State v. Graham, 420 So.2d 1126 (La.1982); State v. Volkmann, supra. Whether or not the requisite intent is present in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is to be guided by the Jackson standard, supra. State v. Huizar, 414 So.2d 741 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2 Cir.1989), writ denied, 544 So.2d 398 (La.1989); State v. Hunter, supra.
In this case, the evidence showed that the defendant was responsible for security of the warehouse and was the only person on duty with a key to the shunt switch for the alarm that sounds when people come in or go out of the warehouse doors. The evidence also established he had been employed there for 19 years and had learned the supervisor's duties through *758 observation of at least two prior supervisors who both had been longtime employees. Both Salzer and Band testified that at approximately 12:50 a.m. Derrick Sterling took several articles from the warehouse and the alarm sounded as he exited the building twice. Approximately twenty minutes later, around 1:10 a.m., Erskine Moore went back and forth from the warehouse several times carrying cases of wine out to the car and the alarm sounded on none of these excursions. According to the defendant, however, he did not turn off the alarm until 1:45 a.m., when he made his final rounds before leaving.
The hypothesis of innocence presented by the defense relies on the following pieces of evidence: Williams' duties involved overseeing the loading of trucks in a noisy area of the warehouse. He had received no formal training in the warehouse security procedures or systems. Neither Salzer nor Band saw him assist physically in removing the stolen goods and, although he was riding in the car with the stolen merchandise, he greeted Salzer in a friendly manner when Salzer and Band confronted the employees. In addition, the confrontation occurred so quickly Williams did not have a chance to look in the back seat. The implication is that the defendant either did not hear the alarm if the wine was being removed while he was on the loading dock or that he mistakenly left the alarm off; in addition, that his behavior later was that of an innocent rather than a guilty person.
Examining these contrasting interpretations, we conclude there was ample evidence on which the trial judge relied in finding the defendant guilty. The behavior touted by the defense as indications of innocence can as easily be viewed as deceitful attempts to cover up the theft. It is more reasonable to conclude that, as the only employee able to operate the shunt switch, Williams was aware of and assisted in the attempted theft by leaving the alarm off.
Accordingly, viewing the evidence in a light most favorable to the prosecution, we cannot find the State failed to meet its burden of proving defendant guilty beyond a reasonable doubt, because the hypothesis of his innocence was not "reasonable" under the totality of the evidence.

ERROR PATENT
LSA-C.Cr.P. art. 920 provides:
The following matters and no others shall be considered on appeal:
(1) An error designated in the assignments of error; and
(2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.
For the purpose of an error patent review the "record" in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment or sentence. See State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
An error patent review in this case reveals an error in the commitment. Both the transcript and minute entry indicate the defendant was placed on six months inactive probation and ordered to pay court costs and a $100.00 fine. The commitment delineates the various costs and indicates that the payment of court costs and the fine were ordered as special conditions of probation, although the transcript and minute entry do not so reflect. Because the trial judge did not personally impose the payment of court costs and fine as special conditions of probation, they cannot be deemed as such. Therefore, if defendant fails to pay the court costs and fine in the future, such failure cannot be used as a basis to revoke defendant's probation.[2] *759 See State v. Spencer, 564 So.2d 795 (La. App. 5 Cir.1990), writ denied, 568 So.2d 1053 (La.1990) and State v. Arceneaux, 570 So.2d 215 (La.App. 5 Cir.1990). Thus, we will amend the commitment to delete the payment of the fine and court costs as special conditions of probation.
Further review also reveals that the commitment states the defendant was given credit for time served, but the transcript and minute entry do not so reflect. According to LSA-C.Cr.P. art. 880, the court shall give a defendant credit for time served when it imposes sentence. Since art. 880 is mandatory in its language, the defendant must be given credit for time served, despite the fact that it is not specifically stated in the transcript and minute entry. This omission is of no consequence now because execution of defendant's prison sentence was suspended; however, should defendant's probation be revoked in the future, the omission would become relevant and defendant would be entitled to credit for time served.

DECREE
For the foregoing reasons, the defendant's conviction is affirmed and the commitment is hereby amended to delete payment of the fine and court costs as special conditions of probation.
AMENDED AND, AS AMENDED, CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The crime of which the defendant was convicted is not triable by jury because the maximum sentence does not exceed six months. LSA-C.Cr.P. art. 779; LSA-R.S. 14:27, 14:69. Accordingly, this Court has no appellate jurisdiction over it, but we may review it on application for a writ of review. LSA-Const. Art. 5, § 10; LSA-C.Cr.P. art. 912.1. In the interest of judicial economy, we are permitted to treat an appeal improperly taken in a misdemeanor case as a writ application and thereby to rule on its merits. City of New Orleans v. Ballansaw, 475 So.2d 768 (La.1985).
[2] In the event the defendant fails to pay the fine and court costs, collection may be enforced by civil process. LSA-C.Cr.P. art. 886.