JjKLIEBERT, Chief Judge.
The defendant Bryan Bradham was charged by bill of information filed on October 15, 1991 with two counts of molestation of a juvenile in violation of LSA-R.S. 14:81.-2(A)(C). When arraigned on January 8, 1992, the defendant entered a plea of not guilty to both charges. On June 17, 1993, the trial court conducted a preliminary examination and found that there was probable cause to charge him with the offenses. The defendant proceeded to trial on June 22, 1993, and at the conclusion of the three-day trial the jury returned with verdicts of guilty of indecent behavior with a juvenile, (LSA-R.S. 14:81), a lesser charge, on count one and guilty as charged on count two. After denying the defendant’s motion for judgment of acquittal and motion for new trial on October 26, 1993, the trial court sentenced the defendant to five years at hard labor on count one and ten years at hard labor on count two. The court ordered the sentences to be served consecutively with each other and consecutively with any other sentences. The defendant subsequently filed a motion to reconsider sentence on the ground of excessiveness.
|2While residing with Cindy Martin, the defendant sexually abused her son, D.M.[1] According to D.M., on several occasions the defendant would climb into his bed, pull down his pajamas and “rub his penis on my butt.” On other occasions the defendant would awaken him and force him to observe as the defendant engaged in sexual intercourse with Ms. Martin while she was asleep.
The defendant also sexually abused Ms. Martin’s niece, J.B. The incident occurred during a visit on which she was awakened when she felt the defendant “rubbing” her vagina. At the time of the trial, she, too, was 12 years old, the abuse having occurred several years earlier during the same time period as the abuse to D.M.
The defendant contends the trial court erred in denying the defendant’s motion for mistrial on the grounds that several jurors observed the defendant wearing handcuffs during a recess.
Compelling a criminal defendant to stand trial in readily identifiable prison attire over his express objection infringes upon his presumption of innocence and denies the defendant due process of law. LSA-Const. 1974, Art. I, Section 16; State v. Brown, 585 So.2d 1211 (La.1991).
However, the mere fact that a defendant appeared in restraints or may have been viewed by jurors does not in itself constitute reversible error. The mere possibility that a defendant was prejudiced is insufficient to constitute reversible error. Rather, there must be a showing by the defendant that jurors did view defendant and that the viewing resulted in prejudice to the defendant which impacted upon the verdict. State v. Wilkerson, 403 So.2d 652 (La.1981); State v. Newton, 562 So.2d 978 (La.App. 3rd Cir.1990). See also State v. Jasper, 506 So.2d 211 (La.App. 5th Cir.1987).
In the instant case, the defendant was not handcuffed during trial. During the lunch break, one juror saw him in handcuffs as he was being transported from the courtroom. She told one other juror about having *430 seen defendant handcuffed. The remaining four laiurors had no knowledge of the defendant’s being handcuffed on the lunch break.
The trial judge conducted a thorough colloquy with each juror to determine the effect, if any, that their knowledge of the incident might have on their ability to impartially judge the defendant. As can be seen from the record,[2] only two of the six jurors had knowledge of the defendant’s appearance in the hallway in handcuffs and the effect on their judgment was non-existent. Furthermore, as the judge acknowledged in the colloquy, the jurors had already learned that the defendant was currently incarcerated on an armed robbery conviction. Therefore, we find that the trial court was correct in denying defendant’s motion for mistrial.
Next, the defendant argues that the sentences imposed, totalling fifteen years, are excessive.
The Louisiana Constitution in Article 1, Section 20 prohibits the imposition of excessive punishment. Even a sentence within the prescribed statutory limit, may violate a defendant’s constitutional right against excessive punishment. State v. Sweeney, 443 So.2d 522 (La.1983).
A sentence is constitutionally excessive if it is grossly out of proportion to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentencing is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. The sentence imposed will not be set aside' absent a showing of manifest abuse of the trial court’s wide discretion to sentence within statutory limits. State v. Lobato, 603 So.2d 739 (La.1992), appeal after remand, 621 So.2d 103 (La.App. 2nd Cir.1993).
The defendant was convicted of inde-cedent behavior with a juvenile in violation of LSA-R.S. 14:81 and molestation of a juvenile in violation of LSA-R.S. 1481.2(A)(0). For those | ¿convictions, the defendant faced fines of $15,000 and up to twenty-two years in prison; however, no fine was imposed.
In the instant case the sentences imposed are not grossly disproportional to the crime in light of the harm committed to the young victims, who were between the ages of 7 and 10 when the abuse occurred. The sentences imposed amount to a total of fifteen years as opposed to a possible fine of $15,000 and a potential exposure of twenty-two years at hard labor. Furthermore, the defendant’s criminal history included a conviction of armed robbery, thereby demonstrating his propensity for criminal activity. Therefore, we find the sentences imposed are not excessive.
An error patent discussion which was conducted in accordance with LSA-C.Cr.P. art. 920 and State v. Williams, 593 So.2d 753 (La.App. 5th Cir.1992) reveals the following errors.
The sentencing transcript, unlike the hard labor sentencing form, fails to show that the trial court gave the defendant credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence; however, such an allowance is mandatory. LSA-C.Cr.P. art. 880; State v. Sherman, 532 So.2d 908 (La.App. 5th Cir.1988). Therefore, the sentence is amended to confirm the hard labor sentencing form and give the defendant such credit.
Accordingly, for the reasons assigned, defendant’s conviction is affirmed and the sentence is amended to give defendant credit for time served and, as amended, affirmed.

CONVICTION AFFIRMED; SENTENCE AMENDED, AND AS AMENDED, AFFIRMED.

J¿APPENDIX

(AT THE BENCH OUT OF HEARING OF THE JURY)
MR. FLEMING: [Defense Counsel]
It is the lady in grey.
THE COURT:
All right. Mr. Bailiff, would you escort the jury out please for one moment. Ma’am, if you would stay for a second.
*431 (THE JURY LEAVES THE COURTROOM)
THE COURT:
Yes, ma’am. Let me ask you a couple of quick questions.
MS. ARSENEAUX: [Juror]
Okay.
THE COURT:
There may have been a possibility that when the defendant was leaving the courtroom, you may have been coming out the jury box?
MS. ARSENEAUX:
Um-hum. I was going to the rest room. THE COURT:
All right. Did you see him?
MS. ARSENEAUX:
Yes, I saw him.
THE COURT:
Okay. Did you notice anything in particular?
MS. ARSENEAUX:
Well, I saw that he was, you know, leaving, and I saw that he was cuffed.
THE COURT:
Okay. Does that make a difference to you?
MS. ARSENEAUX:
No.
jaTHE COURT:
Was that a surprise to you?
MS. ARSENEAUX:
No really.
THE COURT:
Okay. Any of the other jurors were informed of that?
MS. ARSENEAUX:
Yes.
THE COURT:
You told the other jurors?
MS. ARSENEAUX:
(Nods affirmatively)
THE COURT:
Okay. And did that make any — have any effect on them?
MS. ARSENEAUX:
I don’t know. I can’t—
THE COURT:
Okay. Well, we’re going to have to bring each one in individually and check it out. But as far as you are concerned, ma’am, that has absolutely no effect? It’s not a surprise to you?
MS. ARSENEAUX:
No. No, it wasn’t a surprise.
THE COURT:
Mr. Fleming, do you have any questions? MR. FLEMING:
No, your Honor. You’ve asked all that I would have asked.
MR. HESNI: [Prosecutor]
None, your Honor.
THE COURT:
All right. Thank you. You can go back to the jury box. Would you please send them in one at time. Okay, hold them for one second while I take the objection on the record. All right, Mr. Fleming, you had objected in Chambers and you came out here.
(MS. ARSENEAUX LEAVES THE COURTROOM)
JjjMR. FLEMING:
Yes, your Honor. I’m objecting to the continuation of this trial. I guess I’m going to move for a mistrial and I would object to further proceedings on the grounds that they may have been prejudiced by what they saw. THE COURT:
Okay. Well, what I’m going to do— MR. HESNI:
Your Honor, the State’s position is this defendant, this jury, already knows that this defendant committed an armed robbery. This jury knows that the wife committed an armed robbery. This jury saw the wife come in prison orange in handcuffs. They know he’s in custody. I don’t see how they are prejudiced. And there was a lot of case law that says that as well.
*432 THE COURT:
All right. What I intend to do and have started to do is interview each juror, find out if they had learned that he was in handcuffs and if it had any effect, and I’ll make a decision afterwards. Mr. Hesni, your point is well taken that in this particular ease, this particular defendant was already serving time for another offense, not just this offense; that the jury well knew that he was in custody at the time of this trial. Okay. Let’s bring in the next juror.
(MR. CHABERT ENTERS THE COURTROOM)
THE COURT:
Mr. Chabert?
MR. CHABERT: [Juror]
Yes,, sir.
THE COURT:
Okay. Mr. Chabert, my understanding is that one of jurors at lunch time happened to notice the defendant and she informed you as to this particular state; is that correct? MR. CHABERT:
I don’t remember anybody informing me about anything.
THE COURT:
UMr. Fleming, do you have a question or— MR. FLEMING:
No, your Honor.
MR. HESNI:
None, your Honor.
THE COURT:
Thank you. You can go back to the jury room.
(MR. CHABERT LEAVES THE COURTROOM)
(MS. O’ROURKE ENTERS THE COURTROOM)
THE COURT:
Ms. Arseneaux?
MS. O’ROURKE: [Juror]
No. O’Rourke
THE COURT:
Oh! You’re — okay. I’m sorry.
MS. O’ROURKE:
He just told me to sit anywhere.
THE COURT:
Ms. O’Rourke, was there any conversation at lunch about what one of the jurors may have seen? Do you remember anything? MS. O’ROURKE:
No. In reference to what?
THE COURT:
Mr. Fleming, do you want to ask any questions?
MR. FLEMING:
No, your Honor.
THE COURT:
Do you have any questions you wish me to ask?
MR. FLEMING:
No, your Honor.
THE COURT:
The State?
MR. HESNI:
I have no questions, your Honor.
THE COURT:
15A1 right, ma’am. Thank you.
(MS. O’ROURKE LEAVES THE COURTROOM)
(MS. DEVALL ENTERS THE COURTROOM)
THE COURT:
Ms. Devall?
MS. DEVALL [Juror]
Yes.
THE COURT:
Ms. Devall, it comes to my attention that one of the jurors may have seen something right before lunch or during lunch, and may have said something about it to anyone. Do you remember any conversation?
MS. DEVALL:
Yes.
THE COURT:
Okay. And what is that, ma’am?
*433 MS. DEVALL:
That they saw the defendant being handcuffed.
THE COURT:
Okay. Fine. Does that in any way effect you?
MS. DEVALL:
No.
THE COURT:
Does it cause you any undue hardship in making a decision or is it a great surprise to you?
MS. DEVALL:
No.
MR. FLEMING:
Okay, ma’am. Can you decide this case without giving that any consideration?
MS. DEVALL:
Yes.
MR. FLEMING:
Okay. Thank you, your Honor.
THE COURT:
| cAH right. Thank you.
(MS. DEVALL LEAVES THE COURTROOM)
(MR. BAKER ENTER THE COURTROOM)
THE COURT:
Mr. Baker, it’s come to our attention that there is a possibility that one of the jurors may have seen something a lunch and may have said something to one or two of you. Do you know anything about that?
MR. BAKER: [Juror]
No. I don’t know what you’re talking about. I didn’t see anything.
MR. FLEMING:
I have no questions of this gentleman, your Honor.
THE COURT:
Thank you.
(MR. BAKER LEAVES THE COURTROOM)
(MR. ADAMS ENTERS THE COURTROOM)
THE COURT:
Mr. Adams, it’s come to our attention that at lunch one of the jurors may have seen something and they may have communicated it. Do you know anything about which I speak?
MR. ADAMS: [Juror]
No.
THE COURT:
No, sir?
MR. ADAMS:
No.
THE COURT:
Okay. Mr. Fleming, any questions?
MR. FLEMING:
I have no questions of this gentleman, your Honor.
MR. HESNI:
None, your Honor.
THE COURT:
Thank you very much.
_[t(MR. ADAMS LEAVES THE COURTROOM)
(MR. WEBER LEAVES THE COURTROOM)
THE COURT:
Mr. Weber?
MR. WEBER: [Juror]
Yes.
THE COURT:
It has come to my attention that at lunch, one of the jurors may have seen something and may have communicated to some of the jurors. Do you know that which I speak? MR. WEBER:
In the courtroom or out in the jury room or—
THE COURT:
In the jury room or anywhere.
MR. WEBER:
(Nods negatively)
THE COURT REPORTER:
I have to hear you.
*434 MR. WEBER:
Oh! No, I’m sorry.
THE COURT:
Okay.
MR. FLEMING:
I have no questions, your Honor.
MR. HESNI:
None, your Honor.
THE COURT:
Thank you.
(MR. WEBER LEAVES THE COURTROOM)
THE COURT:
Okay. Based on the jurors’ testimony, Mr. Fleming, I’m going to deny your motion for a mistrial.
MR. FLEMING:
For the record, your Honor, I would just note an objection. (R., 646-656)

. At trial in 1993 D.M. was 12 years old. At the time of the abuse, he was between 7 and 10 years of age.

. The colloquy is reprinted at the Appendix at the conclusion of this opinion.