626 So.2d 913 (1993)
STATE of Louisiana
v.
Brian BIBB.
No. 92-KA-998.
Court of Appeal of Louisiana, Fifth Circuit.
November 10, 1993.
Rehearing Denied November 22, 1993.
*918 John M. Mamoulides, Dist. Atty., Dorothy Pendergast, Terry M. Boudreaux, Asst. Dist. Atty., Gretna, for plaintiff-appellee.
Clifford E. Cardone, R. Justin Garon, New Orleans, for defendant-appellant.
Before BOWES, GRISBAUM and DUFRESNE, JJ.
DUFRESNE, Judge.
The defendant, Brian Bibb, was charged with first degree murder of his two children who were below the ages of twelve, (Counts 1 and 2), violations of La.R.S. 14:30 subd. A(5). He was also charged with attempted first degree murder of his wife, (Count 3), a violation of La.R.S. 14:27 and 30. Defendant filed a motion to have a sanity commission appointed. The trial court granted this motion. After a sanity commission hearing, defendant was found competent to proceed to trial. He pled not guilty and not guilty by reason of insanity.
Before the trial, defendant made a motion for a second sanity hearing to determine his competency for trial. After a hearing, the trial court again ruled that defendant was competent to proceed to trial.
On the first day of trial, Count 3 was severed. After the trial, the jury returned a verdict of guilty on Counts 1 and 2. A sentencing phase proceeding was conducted. The jury could not reach a unanimous verdict as to the sentence.
Thereafter, defendant filed a motion for new trial and motion for appeal. The motion for new trial was denied by the trial court. Subsequently, the trial court sentenced defendant on each count to life imprisonment without benefit of probation, parole, or suspension of sentence and with credit for time served. The sentences were to run consecutively. The motion for appeal was signed and granted by the trial court on the same day as the sentencing.
Subsequently, allegations of juror misconduct were made and an investigation was conducted by the sheriff's office. Five months after the trial, defendant filed a second motion for new trial based upon "newly discovered evidence of prosecutorial misconduct and juror misconduct allegations." After argument, the trial court denied this motion, finding that it was divested of jurisdiction and that the appellate court had jurisdiction. After a motion for new trial was filed in this court, we remanded to the trial court for consideration of that motion. The trial court denied the motion, on the basis that it was untimely and not based upon newly discovered evidence.
Defendant now appeals, alleging twenty assignments of error as follows:

*919 ASSIGNMENTS OF ERROR

1. Appellant was denied a trial by a fair and impartial jury and due process of law as a result of the prosecutor's surreptitious display of prejudicial extrinsic evidence to the jury without the knowledge and approval of the court and defense counsel, in violation of defendant's rights granted by the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States.
2. The trial court erred in denying appellant's motion for new trial based on prosecutorial misconduct which arose when the State's attorney secretly presented prejudicial extrinsic evidence to the jury without the knowledge of the court and defense counsel.
3. The trial court erred in failing to hold an evidentiary hearing on appellant's well-pleaded allegations of prosecutorial misconduct where the prosecutor improperly communicated with the jury.
4. Appellant was denied his constitutional rights to a fair and impartial jury and to due process of law as a result of jury misconduct resulting from the illicit liaison between a female juror and a deputy sheriff assigned to the sequestered jury.
5. The trial court erred in denying appellant's motion for new trial based on the misconduct of a female juror and a deputy sheriff, assigned to the sequestered jury, who spent the night in the sequestered juror's hotel room and was seen kissing the juror on the lips the following morning.
6. The trial court erred in failing to hold an evidentiary hearing on appellant's well-pleaded allegations of jury misconduct resulting from the illicit liaison between a female juror and a deputy sheriff assigned to the sequestered jury.
7. The trial court erred in determining that the defendant was competent to proceed to trial when the evidence introduced at defendant's second sanity hearing demonstrated that he was incapable of assisting counsel, that defendant would decompensate under the stress of the trial, and that defendant could not testify in his own behalf.
8. The trial court erred in denying appellant's motion for mistrial made after the forcible administration, during trial, of drugs which affected defendant's ability to assist counsel.
9. The trial court erred in failing to hold an evidentiary hearing to establish whether the forced administration, during trial, of anti-depressant and anti-anxiety drugs affected defendant's ability to assist counsel.
10. The trial court erred in admitting into evidence gruesome photographs of the victims when the prejudicial impact of these photographs outweighed their probative value in light of the defense's admission to the murders and the coroner's testimony confirming the cause of death.
11. A preponderance of the evidence properly introduced at trial clearly established that the defendant was legally insane at the time of the offense.
12. The record of evidence was insufficient to support the jury verdict that the defendant was both sane at the time of the offense and guilty beyond a reasonable doubt.
13. The evidence relied upon in this case by the prosecution to prove the essential element of "specific intent to kill or inflict great bodily harm" was not legally sufficient for any rational trier of fact to conclude that the requisite specific intent had been proved beyond a reasonable doubt.
14. The evidence properly introduced at trial was insufficient for any rational trial jury to reasonably conclude that the prosecution had proved beyond a reasonable doubt that the requisite presence of the essential element of specific criminal intent was not precluded by the mental condition of the defendant at the time of the offense charged.
15. The sentences imposed on the defendant are constitutionally cruel, unusual and excessive under both the United States Constitution and the Louisiana Constitution.
16. The trial court erred in failing to suspend the trial upon the defense's motion to suspend the proceedings as a result of the *920 defendant's incapacity to proceed resulting from his inability to assist counsel.
17. The State's systematic and flagrant misconduct in refusing to timely produce requested exculpatory and inculpatory evidence placed defendant at an extreme disadvantage and unconstitutionally deprived defendant of a full and fair trial and due process of law.
18. The court erred in refusing to allow the defense the opportunity to show to the potential jurors, during voir dire, the gruesome photographs of the slain children which were ultimately introduced into evidence. The defendant was unable to determine whether the potential jurors were subject to undue prejudice as a result of viewing the gruesome photographs and defendant was prejudiced by this bar in the jury selection process.
19. The court's error in refusing to allow the defense the opportunity to show to the potential jurors, during voir dire, the gruesome photographs of the slain children, which were ultimately introduced into evidence, was prejudicial as it deprived defendant of the opportunity to dilute the prejudice created by the mere showing of the gruesome photographs to the jurors.
20. Any and all errors patent on the face of the record.

FACTS
Sunday, June 2, 1991, defendant, Brian Bibb, spent the day with his wife, Sandra Bibb, and their two children, Christopher Bibb, age 5, and Catherine Bibb, age 2. The family went to a child's birthday party in City Park and returned home that afternoon. Later that evening defendant played with his son and bathed the children. About 7:30 p.m., the children kissed defendant goodnight. Mrs. Bibb put the children to bed. Mrs. Bibb returned downstairs and sat with defendant until 8:30 p.m. when she went to bed. Defendant did not go to bed until after 10:00 p.m. Sometime later, Mrs. Bibb awoke when she heard a noise; she went into the kitchen. There she saw defendant trying to unscrew a bottle of liquid Dimetapp medication. Defendant said that he did not feel well. Mrs. Bibb returned to her bedroom and went to sleep.
At approximately 3:30 a.m., defendant woke up Mrs. Bibb. Standing at her side of the bed, he stated that he was going upstairs to sleep in their son's room. She asked if he was all right and he replied that he was. Then, defendant brushed hair off her forehead, put his hand over her nose and mouth, pushed her head into her pillow and began stabbing her with a steak knife. At first she fought back; then, she went limp and closed her eyes. Suddenly, defendant stopped and left the room. Mrs. Bibb left the bedroom and tried to exit the home from the back door. Finally, she unlocked a kitchen window and climbed outside; the house's security alarm was set off.
After stabbing his wife, defendant went upstairs to his children's bedrooms. Although the exact sequence of events is unclear, defendant apparently went to his daughter's room, picked her up from her crib and carried her into his son's room. There he slit his daughter's throat with the same knife used to stab his wife. Defendant also slashed the throat of his son.
The sheriff's office received reports of an alarm at the Bibb home in Kenner and dispatched deputies to that location. Mrs. Bibb was discovered at a nearby home. Once inside the Bibb home, sheriff deputies had to force the son's bedroom door open. Apparently, defendant barricaded the door by pushing a piece of furniture against it. Upon entering, the officers saw defendant nude and laying face down in a prone position with his arms against his body and his fists clenched. Catherine Bibb was laying on the floor and Christopher Bibb's body was half on the bed and half on the floor. To the right of his hand was a knife. Both children were covered with blood and determined to be dead. Brian Bibb was arrested and taken to a local hospital for treatment of self inflicted wounds. Later, the pathologist determined that the children died from the wounds to their necks which cut the trachea and caused them to bleed to death. Each child had defensive wounds on their hands, indicating they were trying to protect themselves.

*921 ASSIGNMENTS OF ERROR NUMBERS ONE, TWO AND THREE

1. Appellant was denied a trial by a fair and impartial jury and due process of law as a result of the prosecutor's surreptitious display of prejudicial extrinsic evidence to the jury without the knowledge and approval of the court and defense counsel, in violation of defendant's rights granted by the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States.
2. The trial court erred in denying appellant's motion for new trial based on prosecutorial misconduct which arose when the State's attorney secretly presented prejudicial extrinsic evidence to the jury without the knowledge of the court and defense counsel.
3. The trial court erred in failing to hold an evidentiary hearing on appellant's well-pleaded allegations of prosecutorial misconduct where the prosecutor improperly communicated with the jury.

DISCUSSION
By assignments of error numbers one, two and three, defendant argues that prosecutorial misconduct denied his right to a fair trial. Specifically, he contends that while investigating alleged juror misconduct, his defense counsel was informed by a juror of several unknown facts: that during the trial an assistant district attorney displayed the book Fatal Vision without his defense counsel's knowledge, that the juror knew of the book's contents and that before deliberations the juror discussed with other jurors this action by the prosecutor. Fatal Vision relates the story of the conviction of Dr. Jeffery McDonald for the killings of his wife and two children and includes information on McDonald's defense claim that a group of people killed his family and attempted to kill him.
Defendant contends that this extraneous evidence was prejudicial and constituted reversible error. He further argues that his discovery of this action constituted newly discovered evidence and that the trial court erred in denying his motion for new trial based upon this ground.
In assignment of error number three, defendant argues that the trial court erred in not holding an evidentiary hearing on the claim that the alleged prosecutorial misconduct resulted in extraneous evidence being presented to the jury. Specifically, defendant argues that the state sought to counteract his insanity defense by contending that defendant planned to blame the murders on a fictitious third party. For that reason, the state referred to the Jeffery McDonald murder case during the trial and secretly displayed the book Fatal Vision. He supports this claim with a reference to the state's rebuttal argument that defendant could not claim an alibi because he was caught in the home and the state's reference to the McDonald case during its cross-examination of an expert. The state contends that there is nothing in the record to show that the book was "displayed" in the manner alleged. It further argues that even if this display occurred and the jurors saw the book, this action was not improper, and there is no basis to conclude there was an effect on the jury or the verdict. According to the state, it had a legitimate interest in the McDonald murders case because they were factually similar to the instant offenses and because Mrs. Bibb testified that she discussed the case with defendant only a few hours before the attacks. It further contends that defendant's motion for new trial was untimely.
During the trial, there were references to the McDonald murders. Sandra Bibb testified about her brief discussion with defendant about the case the evening before the murders. A second reference occurred when the state asked Dr. Roniger during cross examination about defendant and his wife's discussion about the McDonald case.
Furthermore, defense counsel was aware at one point during the trial that the book was in the courtroom. In his brief, defense counsel claims that he objected to the book during the recess and the trial court vehemently ordered the book removed from the courtroom. However, the transcript indicates the trial court ordered that a book (a specific title was not mentioned) be placed under the bench.
*922 A defendant's constitutional due process right of fair trial by an impartial jury may be violated if the trial jurors are subjected to influences which cause their verdict to be influenced by circumstances other than the evidence developed at trial. Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); State v. Marchand, 362 So.2d 1090, 1092-1093 (La.1978). In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. Turner v. Louisiana, 379 U.S. at 473, 85 S.Ct. at 550.
Initially in any trial, there is a presumption of jury impartiality. United States v. Winkle, 587 F.2d 705, 714 (5th Cir.), cert denied, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). However, any unauthorized communication, contact, or tampering directly or indirectly, made by a non-juror with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, if not made in accordance with rules of court and the instructions and directions of the court made during the trial, with full knowledge of all the parties. The presumption is not conclusive, but the burden rests heavily upon the state to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to defendant. Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); State v. Marchand, 362 So.2d at 1092. Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury's deliberations. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the state to show that the influence demonstrated was not prejudicial. United States v. O'Keefe, 722 F.2d 1175, 1179 (5th Cir.1983); United States v. Howard, 506 F.2d 865, 869 (5th Cir.1975); State v. Sinegal, 393 So.2d 684, 687 (La.1981).
We fail to see how the prosecutor's reading of the book and the jurors' view of it, if indeed it occurred, constituted communication, tampering or contact with the jury. It was the juror's own personal knowledge of the book's contents that gave it meaning to the jurors. Thus, this action is not presumptively prejudicial. Furthermore, we do not believe defendant has adequately shown that this action constituted an extrinsic factual matter which influenced the jury. Defendant merely makes these allegations in his motion for new trial. He does not attach any affidavit by a juror or jurors supporting his allegations.
Moreover, we note that during the trial when defense counsel did see the book and requested it be put below the bench, he did not make a motion for mistrial. Nor did he request an admonition to the jury or special jury instruction about this book.
Thus, for the above reasons, we find no error in the trial court's ruling denying the motion for new trial and in failing to hold an evidentiary hearing. (See discussion on Assignment of Error Numbers 4, 5, and 6.)
These assignments of error lack merit.

ASSIGNMENTS OF ERROR NUMBERS FOUR, FIVE AND SIX
4. Appellant was denied his constitutional rights to a fair and impartial jury and to due process of law as a result of jury misconduct resulting from the illicit liaison between a female juror and a deputy sheriff assigned to the sequestered jury.
5. The trial court erred in denying appellant's motion for new trial based on the misconduct of a female juror and a deputy sheriff, assigned to the sequestered jury, who spent the night in the sequestered juror's hotel room and was seen kissing the juror on the lips the following morning.
6. The trial court erred in failing to hold an evidentiary hearing on appellant's well-pleaded allegations of jury misconduct resulting from the illicit liaison between a female juror and a deputy sheriff assigned to the sequestered jury.

DISCUSSION
In assignments of error numbers four and five, defendant contends that his rights to a fair trial and due process were violated *923 by the misconduct during the trial by a female juror when she spent the night with a male deputy sheriff assigned to the sequestered jury and they were seen kissing the next morning. Defendant argues that this "illicit liaison" created a "pro-state influence on the juror" and the state cannot show that this influence was harmless. He further contends the trial court erred in denying his motion for new trial based upon this newly discovered evidence.
In assignment of error number six, defendant argues that the trial court erred in failing to hold an evidentiary hearing on the issue of jury misconduct. He contends that this court should remand for a hearing.
In the state's short argument on these assignments, it argues that the contact between the juror and deputy occurred after the guilty verdict was returned. To support this argument, the state attaches to its brief a report summarizing the juror's statement in which the juror states that the contact occurred after the verdict was rendered and before the sentencing phase of the trial was completed. The state further argues that defendant is not entitled to an evidentiary hearing because he cannot show that injustice had been done.
Approximately two months after the trial court sentenced defendant and his motion for appeal was granted, the trial court held a hearing to notify defendant of an investigation which was conducted by the sheriff's office concerning an incident involving a sheriff's deputy and a sequestered juror. A copy of the sheriff's office report was given to defense counsel but was not introduced into the record. Subsequently, defendant filed a motion to require the offices of the sheriff and district attorney to turn over all investigative reports related to jury misconduct. At the hearing on this motion, the state argued that both the state and defendant had an opportunity to investigate the allegations. The state contended that even if the contact were improper, it occurred after the verdict and prior to the conclusion of the sentencing phase. Since the jury did not recommend the death penalty, there was no prejudicial effect.
In regard to the merits of the misconduct allegations, the transcript of this hearing reveals the following colloquy, in pertinent part:
MR. ROTHCHILD: [Assistant District Attorney]
Well, Judge, just to supplement the record on appeal.
Mr. Cardone is going to make this an appeal issue. The appellate court is going to be left with a blank record. The appellate court is going to have to remand this back to Your Honor to have a hearing to determine whether or not there was any jury misconduct.
The State's position is that there was totally no misconduct; that everything even if there was any suggestion of anything improper happening, it happened after the verdict came back and before the sentencing. Since the sentencing was in the Defendant's favor, that issue is mooted. It could not possibly have an effect on the Defendant.
THE COURT:
Mr. Cardone.
MR. CARDONE:
Your Honor, that's just my point. The investigative report that's been submitted to the Court and to both of us is not clear on whether misconduct took place after verdict or before verdict; we don't know. This report is silent. That's why I'm asking for discovery.
And I think Mr. ROTHCHILD is talking about having a blank record on this issue; that's not true. What I'm doing is trying to get discovery so that I can then file a Motion for a New Trial, but I need evidence.
They're conducting their own investigation. Jurors won't talk to me. Police officers won't talk to me. Sure, I have a right to ask them questions; they're going to respond to the power of the state more then they're going to respond to a criminal defense lawyer in this situation.
They've got an entire investigation that's complete. It is true I've spoken to that one juror, but no one else. Everyone is *924 mum on the issue. No one wants to get involved at this point.
And, truly, the Court can understand how my hands are tied. Deputy sheriffs aren't going to talk to me about this; they'll talk to the State; they'll talk to the hierarchy in the Sheriff's Department.
That's the information I want. All I have here is a capsulized version of an investigation. I don't have statements. I'd like to see those statements, because this is someone's interpretation of what happened.
And Ms. Gebb's representation that misconduct took place after verdict and before sentencing is not represented in this capsulized version at all. It's silent on that issue.
THE COURT:
But, you concede you had the right and did talk to Ms. Gebb?
MR. CARDONE:
I spoke with Ms. Gebb, that's correct.
THE COURT:
I'm ready to rule gentlemen.
In connection with this matter, the Court recalls that it gave both the State and the Defense opportunity, free opportunity, to conduct any investigations they thought necessary or proper to investigate and talk to whoever, whomever they wanted to.
The defense was immediately furnished with the report the Court had from the Sheriff's Office. In my opinion, to grant to the Defense the request that it has made before the Court is tantamount to giving a license for a fishing expedition.
I'm going to deny that request. Note the Defense's objection to my ruling at this time.
Defense counsel also requested and apparently received documentation indicating the dates, times and location the particular sheriff deputy worked during the trial when the jury was sequestered. However, these documents, the investigative report and the juror's statement were not introduced into the record and are not available for our review. This Court has no authority to receive or review evidence not contained in the trial court record. State v. Martinez, 552 So.2d 1365, 1368 (La.App. 5th Cir.1989).
Subsequently, defendant filed a second motion for new trial based upon the discovery of newly discovered evidence, including the alleged violation of the sequestration order by the contact between the female juror and the sheriff's deputy. The trial court ruled that this motion for new trial, filed after the granting of the appeal, was untimely and that the jurisdiction of the case was in the appellate court.
Defendant also filed a motion for new trial in this court in August of 1992, Brian Bibb v. State of Louisiana, (92-KM-733). This court ordered that this matter be remanded to the trial court for consideration and disposition of the motion. After remand, the trial court apparently ruled that defendant's grounds for the new trial motion were based upon a prejudicial defect in the proceedings not discovered before the verdict, La.C.Cr.P. art. 851(4), and that the ends of justice would be served by granting of a new trial, La. C.Cr.P. art. 851(5). A motion based upon these grounds, unlike the ground of newly discovered evidence in La.C.Cr.P. art. 851(3), must be filed before sentence. If the ground relates to newly discovered evidence, La. C.Cr.P. art. 853 allows one year after verdict or sentence for the timely filing of this motion. Thus, the trial court denied the motion as untimely.
Louisiana law provides that the jury in a capital case shall be sequestered after each juror is sworn so as to be secluded from outside communication. La.C.Cr.P. art. 791. The purpose of sequestering jurors is to protect them from outside influence and from basing their verdict upon anything other than the evidence developed at trial. State v. Marchand, 362 So.2d 1090 (La.1978). As indicated in the discussion of assignment of error numbers one, two and three, the jury is presumed to be impartial. United States v. Winkle, 587 F.2d at 714. Any unauthorized communication or contact made by a non-juror with a juror during a trial about the matter pending before the jury is presumed prejudicial. State v. Marchand, 362 So.2d at 1092.
*925 Furthermore, in State v. Graham, 422 So.2d 123, 131 (La.1982), the Louisiana Supreme Court noted a distinction in the related rule concerning juror misconduct. Citing Durr v. Cook, 589 F.2d 891 (5th Cir. 1979), that Court determined that to obtain an evidentiary hearing when defendant's claim is based upon allegations of juror misconduct, an accused must make well pleaded allegations that such misconduct violated his constitutional right to due process, to confront and cross-examine witnesses, or to a trial by a fair and impartial jury. After receipt of this evidence, a new trial is warranted upon a showing that a constitutional violation occurred and that a reasonable possibility of prejudice exists. State v. Cantu, 469 So.2d 1083, 1085 n. 1 (La.App. 2nd Cir. 1985).
If indeed as the state argues, the contact between the juror and the sheriff deputy occurred after the verdict was rendered and prior to the end of the sentencing phase, no prejudice could have occurred. Obviously, this contact could not have affected the verdict. Since the jury did not recommend the death penalty, the defendant was not prejudiced. However, if the contact occurred prior to rendition of the verdict, the nature of the contact (the type and if it was about a matter pending before the jury) needs to be explored to determine if it was prejudicial and, if so, to give the state an opportunity to show that it was harmless. Since we are unable to make this determination based upon the appellate record, we remand for an evidentiary hearing as to this allegation. If after this hearing, the trial court determines that the contact occurred after the verdict was rendered, there would be no merit to defendant's assignments of error concerning these allegations. If the contact were otherwise, the trial court should make a determination as to whether the contact was prejudicial, constituted reversible error and whether a new trial is warranted.
At an evidentiary hearing, testimony may be presented, including that of jurors. When a statutory prohibition against juror testimony infringes on a defendant's constitutional right to a fair trial by an impartial jury, jurors are competent to testify about juror misconduct. Durr v. Cook, 589 F.2d at 893. La.C. of Evid. art. 606B provides:
B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
Comment (c) to this article states:
(c) In embracing for criminal cases the exceptions to the general testimonial juror disqualification rule contained in Federal Rule of Evidence 606(b), this Article rejects the approach taken in former R.S. 15:470 and R.S. 15:471 of attempting to prohibit all testimony by jurors impeaching their verdicts.
Thus, under the exception in La.C. of Evid. art. 606(B), jurors are allowed to testify as to whether any outside influence was improperly brought to bear on their deliberations.
Regarding assignment of error number six, we cannot find anywhere in the record a request by defendant that the trial court hold an evidentiary hearing on the issue of jury misconduct. Since there was no request for such, the trial court did not err in failing to hold an evidentiary hearing.
Because we are remanding this matter, we normally would pretermit the issues raised regarding the denial of the motion for new trial. Nevertheless, we will address this issue.
*926 Louisiana Code of Criminal Procedure article 851 sets forth grounds for a new trial. That article provides:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
Under Louisiana jurisprudence, when the motion for new trial is based on newly discovered evidence, the following four requisites must be met: 1) the evidence must have been discovered since the trial; 2) the failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence; 3) the evidence must be material to the issues at trial; and 4) the evidence must be of such a nature that it would probably produce an acquittal in the event of a retrial. La.C.Cr.P. art. 854; State v. Prudholm, 446 So.2d 729, 735 (La.1984); State v. Talbot, 408 So.2d 861, 884 (La.1980), on rehearing.
The trial court's ruling regarding whether these requisites are found is entitled to great weight, and his denial of a motion for new trial will not be disturbed on appeal absent a clear abuse of that discretion. State v. Knapper, 555 So.2d 1335, 1339 (La.1990); State v. Williams, 580 So.2d 497, 500 (La. App. 4th Cir.), writ denied, 585 So.2d 566 (La.1991).
Defendant contends that newly discovered evidence includes the discovery of information of alleged unauthorized communication or juror misconduct which prejudiced the jury. To support this contention, defendant cites two federal cases, United States v. Endicott, 869 F.2d 452 (9th Cir.1989) and Holmes v. United States, 284 F.2d 716 (4th Cir.1960), in which newly discovered knowledge of jury misconduct constituted newly discovered evidence for purposes of a new trial.
Under Federal Rule of Criminal Procedure, Rule 33, after seven days from the date of the verdict, a motion for new trial cannot be entertained unless it is based on newly discovered evidence. Generally, under Rule 33, the mover must show the same four requisites required under Louisiana Law. United States v. Williams, 613 F.2d 573, 575 (5th Cir.), cert. denied, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980); United States v. Sjeklocka, 843 F.2d 485, 487 (11th Cir.1988). Nevertheless, several federal courts have recognized the propriety of categorizing a motion based upon allegedly improper communication to a juror as one for a new trial based upon newly discovered evidence. United States v. Sjeklocka, 843 F.2d at 487; United States v. Endicott, 869 F.2d at 457; Holmes v. United States, 284 F.2d at 719.
In United States v. Williams, 613 F.2d at 575, the Federal Court of Appeals noted the distinction in the newly discovered evidence that goes to the fairness of the trial rather than to the question of guilt or innocence. That court found that a corollary to the requisite that the evidence probably produce an acquittal was that the newly discovered evidence afford reasonable grounds to question the fairness of the trial or the integrity of the verdict. United States v. Williams, *927 613 F.2d at 575; See Southern Pacific Co. v. Francois, 411 F.2d 778, 780 (5th Cir.1969).
Herein, the trial court ruled that defendant's allegations did not present grounds for a new trial based upon newly discovered evidence. Louisiana law is clear that the new evidence must be so material that it ought to produce a verdict different from that rendered at trial. State v. Clayton, 427 So.2d 827, 832 (La.1982), on rehearing. We cannot find any Louisiana cases in which this same issue is presented or which indicate Louisiana courts would interpret the statutory provision for new trial as the federal statute is interpreted. Herein, the new information was not evidence which could be admitted at trial. Defendant has not demonstrated the existence of any new evidence which could produce a verdict different from that rendered at trial. Therefore, we find no error in the denial of the motion for new trial.
Notwithstanding our remand for an evidentiary hearing, as to the allegation of juror misconduct, we find these assignments of error lack merit.

ASSIGNMENTS OF ERROR NUMBERS SEVEN AND SIXTEEN
7. The trial court erred in determining that the defendant was competent to proceed to trial when the evidence introduced at defendant's second sanity hearing demonstrated that he was incapable of assisting counsel, that defendant would decompensate under the stress of the trial, and that defendant could not testify in his own behalf.
16. The trial court erred in failing to suspend the trial upon the defense's motion to suspend the proceedings as a result of the defendant's incapacity to proceed resulting from his inability to assist counsel.

DISCUSSION
In assignment of error number seven, defendant argues that the trial court erred in ruling that he was competent to proceed to trial after the second sanity hearing held on January 13, 1992. He contends that the evidence at this hearing demonstrates that he was incapable of assisting counsel, that he would decompensate under the stress of trial and that he could not testify in his own behalf. In assignment of error number sixteen, defendant contends that the trial court erred in denying his motion for mistrial during voir dire on January 28, 1992, based defendant's inability to assist counsel.
The state argues that the trial court did not abuse its discretion in finding defendant competent to stand trial.
It is fundamental to our adversary system of justice that a defendant who lacks the capacity to understand the proceedings against him or to assist counsel in preparing a defense may not be subjected to trial. La.C.Cr.P. art. 641. State v. Perry, 502 So.2d 543, 548 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). The issue of present sanity or mental incapacity to proceed may be raised at any stage of the proceedings. La.C.Cr.P. art. 642.
A conclusion that one is mentally retarded, defective or diseased does not of itself establish present insanity. However, when mental retardation, defect or disease, alone or in combination, is so severe that a defendant is unable to understand the object, nature, and consequences of the proceedings against him, to communicate with counsel in a meaningful manner, to recall and relate the circumstances connected with the offense, to testify in his own behalf, and to assist reasonably and rationally in a defense of the charge against him, that defendant is within the contemplation of our law, presently insane and unable to stand trial. State v. Charles, 450 So.2d 1287, 1289 (La.1984); State v. Augustine, 252 La. 983, 215 So.2d 634, 638-639 (1968).
The law presumes the defendant's sanity. La.R.S. 15:432. Defendant has the burden of proving by a clear preponderance of the evidence that as a result of a mental disease or defect he lacks the capacity to understand the proceedings against him or to assist in his defense. State v. Brooks, 541 So.2d 801, 805 (La.1989); State v. Pravata, 522 So.2d 606, 610 (La.App. 1st Cir.), writ denied, 531 So.2d 261 (La.1988). While a *928 court is permitted to receive the aid of expert medical testimony on the issue, the ultimate decision of competency is the Court's alone. La.C.Cr.P. art. 647; State v. Brooks, 541 So.2d at 805; State v. Pravata, 522 So.2d at 610.
The trial court is required to order a mental examination of the defendant only when it has a reasonable ground to doubt the defendant's mental capacity to proceed. La.C.Cr.P. art. 643; State v. Charles, 450 So.2d at 1290; State v. Volson, 352 So.2d 1293, 1294 (La.1977). The ruling of a district court on a defendant's mental capacity to proceed is entitled to great weight on appellate review, especially where the evaluation of credibility on the resolution of conflicting well-founded medical testimony is concerned, and will not be overturned absent an abuse of discretion. State v. Brooks, 541 So.2d at 807; State v. Leason, 477 So.2d 771, 776 (La.App. 1st Cir.1985).
During the second sanity hearing, Dr. Usdin testified that since the last sanity commission hearing, he saw defendant on two occasions, each visit for approximately ½ hours. His last visit was one week earlier. He opined that defendant was able to assist his attorney, understood the difference between right and wrong, knew the consequences of his actions, and was able to recall appropriate details.
On cross-examination he acknowledged that although he believed defendant had a mental illness and was not well, he was able to assist his attorney. He further stated that defendant would understand the various defenses available to him, could understand complex questioning of witnesses and could assist his counsel in examination of witnesses. Although defendant was on a "suicide watch" and the stress of trial would make defendant more anxious, defendant would still be able to assist his counsel. Although Dr. Usdin diagnosed defendant with a paranoid personality, depression with one psychotic episode and an inability to distinguish between right and wrong at the time of the murders, he acknowledged that defendant is now able to distinguish right from wrong.
Although the doctor did not know for certain the type of medication defendant was taking, he was told by defendant that the prescriptions were an anti-anxiety drug and an anti-depressant medication. Dr. Usdin did not believe the medications were detrimental to defendant's mental health; rather they may have improved his mood.
Dr. Richard Roniger, another psychiatrist, saw defendant for 30-40 minutes the day before the sanity hearing. He opined that defendant was mentally able to stand trial. Although he did not know the medication defendant was receiving, this knowledge would not change his opinion.
Dr. Cox testified that he saw defendant for an hour a few days earlier. Because defendant was extremely distraught and gave several incorrect answers, he opined that defendant was not competent to proceed to trial. Dr. Cox was told by guards that defendant had been sitting in his bunk for the last couple of days staring at pictures of his family.
He further testified that there would be times when defendant could not understand complex questions asked of witnesses. However, defendant could pick up distortions and misstatements in the testimony of witnesses.
In order for defendant to achieve competency for trial, Dr. Cox recommended that defendant be placed in a maximum security psychiatric hospital and receive more comprehensive psychiatric treatment. Like the other psychiatrists, he did not believe the medications affected defendant's competency or prevented him from responding.
Dr. Richoux testified that he had treated defendant for the previous several months and he usually sees defendant once a week. He stated that he doubted defendant could assist in his defense at trial. This opinion was based upon the doctor's visits with defendant in which he found that defendant's level of psychiatric functioning "waxes and wanes to a severe degree over time." Some days he is lucid; others he is detached. Dr. Cox further testified that defendant demonstrated confusion and paranoia and has made a serious suicide attempt while incarcerated. He admitted it was a "borderline call as to [defendant's] competency at this time."
*929 The trial court concluded that, after evaluating the testimony of the expert witnesses, defendant was competent to proceed to trial. In its reasons, the court noted that Drs. Usdin and Roniger testified strongly that defendant was competent and that Dr. Cox's opinion was different, but his testimony was not as strong. He also stated that Dr. Richoux, who has seen defendant on a number of occasions, does not feel defendant is competent.
Based upon our review of the record, we find that the trial court's ruling, after the second sanity hearing, that defendant possessed mental capacity to proceed, is amply supported by the record. Defendant has not proved that he lacked the capacity to understand the proceedings or to assist in his defense.
As to defendant's motion for mistrial during voir dire, the pertinent part of the colloquy and trial court's reasoning is as follows:
MR. CARDONE:
Your Honor, my client is unable to assist me at this time. He is not responding to me. I request a mistrial.
* * * * * *
THE COURT:
Please be seated. Thank you.
For the record, at this time there are no prospective jurors in the courtroom.
Mr. Cardone, do you want place [sic] anything on the record?
MR. CARDONE:
Yes, Your Honor. After the selection process that we just completed, I attempted to talk to Mr. Bibb about his choices of jurors for the ultimate jury, and he was unable to respond to any of my questions. He buried his face in his hands, he can't stop crying. He's incoherent at this point in time. I'm asking the Courtand I'm telling the Court that he can't assist Counsel.
I'd like to recess until such time that he can be seen by one of the psychiatrists to either medicate him so that he can assist me in choosing jurors for his trial, and wait for a response from the psychiatrist and some advice from the psychiatrist as to what to do next.
THE COURT:
Well, I have been and I am looking at Mr. Bibb. Mr. Bibb is somewhat emotional, for the record. He seems like he is aware of the proceeding that is going on, and he has been declared by me competent after two hearings. Certainly he has a right to aid and assist Counsel in his selection of the jurors.
If he does not choose to aid and assist Counsel, there's no mandate that he must.
If he is able to do it and chooses not to, then Counsel must act on his own in selecting the jury and exercising challenges.
I, at this point, will deny the request of Mr. Cardone. Note his objection to my ruling.
Are there other motions at this time?
MR. CARDONE:
Your Honor, I just want to suggest to the Court that this is not a voluntary position on his part; it's involuntary. He can't control his emotions at this point.
He's heard, probably, a hundred and fifty times in open court that he's killed his own children, and he slashed their throats, and at this point in time he can't take anymore of that.
THE COURT:
Well, no doubt it's stressful and burdensome upon Mr. Bibb. It would be on anyone in court in a similar situation.
I rely on my findings before, that he is competent. He is competent at this time, and based on my prior findings and my ruling today, I will go forward and, of course, order that any medical aid or assistance that can be given to Mr. Bibb at the jail be given to him immediately upon his return to the jail, throughout the night, and the morning hours.
You can suggest, Mr. Cardone, who you wishwhat you wish to be done. Certainly, I will convey that to the jail.
MR. CARDONE:
Well, Dr. Richoux has been treating him as the jailhouse psychiatrist. I suggest that he continue doing that.

*930 THE COURT:
Well, I will order that, if Dr. Richoux feelsand I understand Dr. Richoux has treated him as a treating physician also.
MR. CARDONE:
Yes.
THE COURT:
feels that any medication, treatment, observation, tonight, if necessary, that he be afforded the opportunity to see Mr. Bibb on any occasion that he deems necessary and proper.
The fact that the defendant's capacity to proceed is called into question does not, for that reason alone, require the trial court to order a mental examination of the defendant; rather, it must have reasonable grounds to doubt defendant's capacity. La. C.Cr.P. art. 643. The ordering of a sanity commission to inquire into the defendant's present capacity to proceed rests in the sound discretion of the trial court. State v. Payne, 586 So.2d 652, 654 (La.App. 5th Cir. 1991).
In the instant case, the trial court noted that the trial would be stressful on anyone in defendant's situation and that although defendant was emotional, he appeared to be aware of the proceedings. It further ordered medical assistance or medication, if necessary, be given to defendant that evening at the jail. Based upon our review of the record, we find that the trial court did not abuse its discretion in not finding reasonable grounds to doubt defendant's capacity during voir dire and in denying the motion for mistrial.
Thus for the above reasons, these assignments of error lack merit.

ASSIGNMENTS OF ERROR NUMBERS EIGHT AND NINE
8. The trial court erred in denying appellant's motion for mistrial made after the forcible administration, during trial, of drugs which affected defendant's ability to assist counsel.
9. The trial court erred in failing to hold an evidentiary hearing to establish whether the forced administration, during trial, of anti-depressant and anti-anxiety drugs affected defendant's ability to assist counsel.

DISCUSSION
By means of these assignments, defendant contends that the trial court erred when it denied his motion for mistrial based upon the forced administration of medication during the trial and when it failed to hold an evidentiary hearing to establish the medical appropriateness and need for the drugs. Specifically, he contends that the administration of the prescription drug Vistaril interfered with his ability to assist counsel in a competent and rational manner, and that the trial court failed to make any findings about the medical appropriateness of or the detrimental affects of the drug.
As to the denial of the motion for mistrial, the state contends that the administration of the drug was necessary and medically appropriate as evidenced by the decision of the prison and treating psychiatrist that defendant receive the drug. Further, it argues the record contains no evidence that the drug affected defendant's ability to assist counsel and that the administration of the drug cannot be considered forced since it was prescribed by defendant's treating physician. Also, the state argues that since defendant did not request an evidentiary hearing, the failure to hold such a hearing cannot be addressed on appeal. During the trial, defense counsel made a motion for mistrial. The pertinent part of the transcript is as follows:
MR. CARDONE:
Judge, prior to the last break, during Mrs. Bibb's testimony, Brian Bibb broke down and sobbed and was totally ineffective in assisting us, and I want the record to reflect that he was carried from the courtroom by the Deputy Sheriffs, sobbing and moaning.
I now am told that he's being given Vistaril by the prison psychiatrist. And as a result, we feel that he's unable to assist Counsel.
THE COURT:
What are you doing at this time, would you have motions?
MR. CARDONE:
We ask for a mistrial.

*931 THE COURT:
That motion is denied. Mr. Bibb in [sic] back in court. I can visually observe him. He has been given Vistaril by
All right, let me have your attention. No talking in this courtroom.
he has been given Vistaril, as per Dr. Richoux, his doctor's instructions. He is now in court; appears to be emotional, certainly. He cannot help be otherwise, but he is, in my opinion, ready to go to trial and continue.

Deny the motion and we'll proceed.
To support his argument, defendant cites two federal cases regarding the forcible administration of anti-psychotic drugs to a defendant. In Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the United States Supreme Court found that a prison inmate's interest in avoiding the forced administration of anti-psychotic drugs was protected under the Fourteenth Amendment. However, that Court held that due process allows a mentally ill inmate to be treated involuntarily with anti-psychotic drugs where there is a determination that the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest. Washington v. Harper, 494 U.S. at 225-229, 110 S.Ct. at 1039-1040.
In Riggins v. Nevada, ___ U.S. ___, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), Riggins sought to suspend the forced administration of an anti-psychotic and anti-seizure medication during his trial. An evidentiary hearing was held and Riggins was denied an order to terminate the medication. In that case the parties agreed the administration of the drugs was forced. Since defendant did not claim the administration of the anti-psychotic drug was medically improper treatment, its administration was presumed to be medically appropriate. However, the United States Supreme Court reversed the conviction, finding that the record did not contain a finding that supported a conclusion that administration of the anti-psychotic medication was necessary to accomplish an essential state policy. Riggins v. Nevada, ___ U.S. ___, 112 S.Ct. at 1817.
Moreover, defendant cites State v. Perry, 610 So.2d 746 (La.1992), in which anti-psychotic drugs were forcibly administered to a death row inmate to make him competent for execution. The Louisiana Supreme Court found that the reason for forcible injection of the drugs, capital punishment, was not medically appropriate.
The instant case is distinguishable from the above cited cases in at least two respects: First, here the drug being administered, Vistaril, was an anti-anxiety medication, not an anti-psychotic medication. Second, the drug, administered by defendant's treating psychiatrist, was not forcibly administered.
As to the affects of the drug Vistaril, Dr. Robichaux expressed, during the second competency hearing, that he considered changing defendant's medication, but did not because of the closeness of the trial date. However, he did not say that Vistaril was medically inappropriate or that it diminished defendant's ability to comprehend or assist counsel.
Furthermore, defendant failed to request an evidentiary hearing on the administration of medication. Since defendant did not, at the time he sought a mistrial, request the hearing, he cannot now complain of the trial court's failure to grant such a hearing. See La.C.Cr.P. 841.
The actual issue herein is whether defendant was competent to proceed with the trial. It is well settled that the determination of the trial judge as to the competency of the defendant to stand trial is entitled to great weight on appeal, and that such a determination will not be overturned absent an abuse of discretion. State v. Kaysen, 464 So.2d 793, 796 (La.App. 5th Cir.), writ denied, 466 So.2d 455 (La.1985). We find no abuse of discretion in the trial court's determination as to competency. The record indicates that during the second sanity hearing Dr. Cox stated he did not believe the medication would affect defendant's ability to assist in his defense. Moreover, the trial court was able to observe defendant throughout numerous pre-trial motions and during the trial. See State v. Nix, 327 So.2d 301, 324, cert. denied, 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976); Maggio v. Fulford, 462 *932 U.S. 111, 116, 103 S.Ct. 2261, 2263, 76 L.Ed.2d 794 (1983).
Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER TEN
10. The trial court erred in admitting into evidence gruesome photographs of the victims when the prejudicial impact of these photographs outweighed their probative value in light of the defense's admission to the murders and the coroner's testimony confirming the cause of death.

DISCUSSION
In this assignment of error, defendant argues that the trial court erred in admitting six color photographs which gruesomely depicted his slain children. He contends that the prejudicial impact of these photographs outweighed their probative value, particularly in light of his admission of the murders, stipulation of the children's ages and the coroner's testimony confirming the cause of death. He further contends that in weighing the probative value against its prejudicial effect, the state introduced photos only to arouse the jury's sympathy. Additionally, he argues that the jurors were visibly distressed after viewing the photographs. The state argues that the photographs were unpleasant but their prejudicial impact did not outweigh their probative value.
The photographs of these two very young children with their throats cut are certainly gruesome and unpleasant. However, the mere fact that a photograph is gruesome does not in and of itself render the photograph inadmissible. The test of admissibility is whether the probative value outweighs any prejudicial effect which may result from the display to the jury. State v. Eaton, 524 So.2d 1194, 1201 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); State v. Dean, 487 So.2d 709, 716 (La.App. 5th Cir.), writ denied, 495 So.2d 300 (La.1986). Generally, photographs of a homicide victim's body which show the fatal wound are relevant to prove the death, to corroborate other evidence of the cause of death, to establish the location, severity, and number of wounds, and to prove the identity of the victim. State v. Dean, 487 So.2d at 716.
Further, the Louisiana Supreme Court stated in State v. Scott, 337 So.2d 1087, 1089 (La.1976) that "in situations where the state has already made out its case and the photographs are merely cumulative in nature and are not `substantially necessary to show material facts or conditions' the probability is high that the probative value of these pictures will be outweighed by their prejudicial effect." However, that court found that as a practical matter, the introduction of these photos is routinely upheld if any probative value or relevance is demonstrated by the state.
The six 8 by 10 inch color photos depict the children's bodies as they were found. Photos S-16 and S-19 show the wound to Catherine Bibb's throat and the manner and position in which her body was found. Photos S-17 and S-21 show Christopher Bibb's blood splattered body and the manner, position and location in which he was found. Photo S-23 shows a full view of Christopher's body and contains a greater view of the bedroom. S-18 shows the location of the bodies of both children in the bedroom.
Herein, the identity of the victims is not at issue. However, the jury was required to determine whether defendant had specific intent to kill or inflict great bodily harm. These photos are relevant to show the severity of the attack and the wounds, and the manner in which the bodies were found. Those facts are pertinent to the contested issue of specific intent. See State v. Richard, 525 So.2d 1097, 1101-1102 (La.App. 5th Cir.1988), writ denied, 538 So.2d 609 (La. 1989). Thus, any prejudicial effect of the photographs is outweighed by their probative value.
Defendant cites several cases which he claims support his arguments. He contends that in State v. Gilmore, 332 So.2d 789, 795-796 (La.1976), the Louisiana Supreme Court found that admission of the photos of the victim was rendered unnecessary by defendant's stipulation to the identity of the victim. *933 In Gilmore, the contested photo was taken at the morgue and was found to be especially gruesome. The issue was whether defendant's stipulation as to the identity of the victim could prevent the state from placing the photo in evidence. Contrary to defendant's interpretation of the case, the Louisiana Supreme Court held that upon retrial (the conviction was reversed on other grounds) the trial judge was to determine whether a stipulation may prevent the admission of the photo into evidence.
Defendant also cites State v. Morris, 245 La. 175, 157 So.2d 728 (La.1963) and State v. Morgan, 211 La. 572, 30 So.2d 434 (La.1947) as authority. In both these cases the Louisiana Supreme Court reversed the convictions based upon the introduction of prejudicial gruesome photographs. However, these cases are distinguishable from the instant case. In State v. Morris, the gruesome photographs were taken during the autopsy of the victim where the cause of death had already been established, defendant admitted killing the victim, and the only remaining issue was whether the homicide was committed intentionally. Other photos of decedent's body disclosing the wounds and their locations were admitted without objection by defendant. In State v. Morgan, the gruesome photographs of the body of the victim were to prove corpus delicti, nature, scope and extent of the wound, when the corpus delicti had already been proven by the coroner's testimony and the introduction of the process verbal of the coroner's inquest, and the nature, scope and extent of the wounds had been described by the coroner. There was no dispute as to these matters at the time of the introduction of these photographs.
Therefore, for the above reasons, this assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBERS ELEVEN, TWELVE, THIRTEEN, AND FOURTEEN
11. A preponderance of the evidence properly introduced at trial clearly established that the defendant was legally insane at the time of the offense.
12. The record of evidence was insufficient to support the jury verdict that the defendant was both sane at the time of the offense and guilty beyond a reasonable doubt.
13. The evidence relied upon in this case by the prosecution to prove the essential element of "specific intent to kill or inflict great bodily harm" was not legally sufficient for any rational trier of fact to conclude that the requisite specific intent had been proved beyond a reasonable doubt.
14. The evidence properly introduced at trial was insufficient for any rational trial jury to reasonably conclude that the prosecution had proved beyond a reasonable doubt that the requisite presence of the essential element of specific criminal intent was not precluded by the mental condition of the defendant at the time of the offense charged.

DISCUSSION
By means of these assignments of error, defendant argues that the evidence was insufficient to support the jury's verdict. Specifically, he argues that a preponderance of the evidence clearly established that he was legally insane at the time of the offenses. He further contends the evidence was insufficient for the jury to find the element of specific intent.
The state argues that the evidence was sufficient to prove the offense and that defendant did not rebut the presumption of sanity. The state bases this argument upon the testimony of the experts and lay witnesses, the facts of the actual attacks and defendant's behavior at the hospital following the attacks. It further contends that there was sufficient evidence from the circumstances and actions of defendant to conclude the state introduced evidence to prove specific intent.
The state bears the burden of proving beyond a reasonable doubt each element of the crime necessary to constitute defendant's guilt. La.R.S. 15:271. State v. Pravata, 522 So.2d at 613. However, in Louisiana a defendant is presumed sane at the time of the offense; the state is not required to prove sanity. La.R.S. 15:432. State v. Weber, 364 So.2d 952, 956 (La.1978); State v. Jackson, 548 So.2d 29, 30 (La.App. 5th Cir. 1989). A defendant who wishes to negate *934 the presumption must put forth an affirmative defense of insanity and prove his insanity by a preponderance of the evidence. La. C.Cr.P. art. 652; State v. Jackson, 548 So.2d at 30. Legal insanity in Louisiana means that a defendant has a mental disease or defect which prevents him from distinguishing right from wrong with reference to the conduct which forms the basis for the criminal charge against him. La.R.S. 14:14; State v. Jackson, 548 So.2d at 30.
The question of whether or not defendant affirmatively proved his insanity and should not be held responsible for his actions is one for the jury. All of the evidence, including both expert and lay testimony, and the conduct and action of the defendant, should be considered by the jury in determining sanity. State v. Pravata, 522 So.2d at 614. When a defendant who affirmatively offered the defense of insanity claims that the record evidence does not support a finding of guilty beyond a reasonable doubt, the standard for review by an appellate court is whether or not any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could conclude that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. State v. Claibon, 395 So.2d 770, 772 (La.1981); State v. Jackson, 548 So.2d at 30.
The reviewing court properly looks to the expert and lay testimony and to the defendant's actions. State v. Jackson, 548 So.2d at 31. The factors pertinent to a review of expert testimony are wide-ranging. They include whether lay testimony controverting the expert opinion was offered (State v. Claibon, 395 at 774), whether the experts specifically concluded that the defendant could not discern between right and wrong at the time of the crime (State v. Noble, 425 So.2d 734, 737 (La.1983); State v. Claibon, 395 So.2d at 774), to what extent the expert testimony was premised on the self-serving revelations of the defendant (State v. Parker, 416 So.2d 545, 551 (La.1982)), to what extent the expert analysis is controverted by other expert analysis (State v. Heath, 447 So.2d 570, 576, (La.App. 1st Cir.), writ denied, 448 So.2d 1302 (La.1984)), the duration of the expert's contact with the defendant and whether he had interviewed the defendant previous to the offense (State v. Guidry, 450 So.2d 50, 52 (La.App. 3d Cir.1984), writ denied, 476 So.2d 344 (La.1985)), the chronological proximity of the expert examination to the offense, and whether the experts were treating physicians. State v. Nealy, 450 So.2d 634, 639 (La.1984). Insofar as the defendant's actions, such factors as whether the defendant fled, disposed of evidence, and deliberately planned and executed the offense are pertinent. State v. Pravata, 522 So.2d at 613-614.
Defendant's wife, Sandra Gentile Bibb, testified about the family's activities the weekend of the murders, defendant's behavior the night prior to and during his attack on her, their relationship, and defendant's behavior and actions the few months previous to the murders. Mrs. Bibb stated that both she and her husband were employed at Texaco as petroleum engineers. He was quiet and reserved, a good employee, non-violent, did not abuse alcohol, a good provider and father to their children, never abused her or the children, and was a good husband except when he had "moody spells". She noticed after his grandmother's death about four months before the murders that defendant appeared more quiet and edgy. She was not sure if he was grieving or was stressed. Although he never complained of insomnia to her, she knew of nights when he did not sleep well; she was not aware he was taking any medication for insomnia. Additionally, she did not notice a change in his appetite or energy level. About two or three months before the murders defendant started making complaints about not trusting people at work, including his supervisors. He was also concerned about the safety of his children, although there were no incidents to cause this concern. About one and one-half weeks before the incident he requested a transfer in his company. Defendant did not tell Mrs. Bibb about the request before it was submitted. When he did tell her, Mrs. Bibb stated she was not going to request a transfer. However, she did add that if he had a good reason for wanting to transfer, she would think it over.
*935 On the weekend of the murders, defendant told his wife he decided to go to the Oschner Stress Clinic and was concerned about the affect on his employment. She added that two weeks before she asked defendant if he wanted to see a psychiatrist, he replied "No" and said he did not think he needed to see a doctor.
On Sunday, June 2, the Bibbs took their children to a child's birthday party in City Park. After leaving, they went grocery shopping, went home and put the children in bed for an afternoon nap. Mrs. Bibb left home to shop; when she returned defendant was watching television. When the children awoke, they took the children outside to play. Defendant practiced tee-ball with his son. Later, defendant bathed the children and Mrs. Bibb made dinner. The children played until about 7:30 p.m., when they kissed defendant goodnight and Mrs. Bibb put them in bed.
Later that night she discussed with defendant an article she had read about a murder case in which Jeffery McDonald was convicted of murdering his family but claimed a group of "hippies" conducted the killings. She commented that she could not understand how someone could do that to his children and wife. She went to bed at 8:30 p.m., but defendant stayed up later than usual. Twice between 8:30 and 10:00 p.m., she went to ask defendant if he were coming to bed. Finally, defendant came into the bedroom, went into the bathroom, shut the door and stayed there for about 20 minutes. He came out nude (as he usually slept) and got into bed. Mrs. Bibb's next memory was that she awoke when she heard a noise. She got up and found defendant in the kitchen trying to unscrew a bottle of liquid Dimetapp. He stated he was taking Dimetapp because he did not feel well. She returned to bed. At about 3:30 a.m., defendant woke her up. He was standing at the side of the bed near her. Defendant stated he was going upstairs to sleep in their son's room. She said "Okay." He asked if she were alright and she replied "Yes." Defendant looked normal to her. Then, defendant brushed hair off her forehead and put his hand over her nose and mouth so she could not breath. He pushed her head down into the pillow while he started stabbing her with a steak knife in his left hand. She fought back and tried to force him to stop and then quit fighting. When she closed her eyes and dropped her arms, defendant stopped and left the room. Mrs. Bibb left the bedroom and tried to exit the house from the kitchen door. When she could not do so, she unlocked a window and climbed outside; the security alarm went off. Mrs. Bibb went to two neighbor's houses, but no one answered. Finally, another neighbor responded and let her inside.
Several co-workers testified about defendant's actions prior to the murders. Linda Hart, defendant's supervisor at Texaco, testified that defendant was an exceptional employee who had received the highest ratings. Defendant had an ability to work with others, had a professional relationship with his wife at the office, and worked well with his peers.
Prior to the murders, he was being audited for the third time in six months. Although the number of audits was not unusual, defendant expressed his concern; however, according to Hart, auditing causes everyone concern. Defendant became more quiet in the weeks before June 3 when he requested a transfer. Hart was surprised because defendant was doing his job well and had requested a transfer to an area of the country where Texaco did not have operations. On cross-examination she admitted that Texaco did have offices in the general area of Hershey, Pennsylvania, the residence of defendant's parents.
John Golsby testified that on May 23 defendant requested a transfer to a place nearer his parent's home in Pennsylvania. Upon questioning, defendant was unresponsive and not specific; he just indicated he felt he needed a transfer. Later that same day, Golsby received a computer message from defendant expressing concern for the safety of his family and himself. Golsby showed the message to the division manager, Doug Carriere; they decided to talk with the company's special health services coordinator about defendant. Golsby and Carrier also met with defendant. At this meeting, defendant was not specific about his reasons but felt that he *936 had to leave. He was not sure why he wanted to get closer to home and did not indicate he was under pressure from his job.
Wally Gunning, Texaco's Special Health Services Coordinator, testified that he spoke with defendant on May 28 for 40 minutes. Although there was no specific problem, defendant appeared very suspicious, said he wanted to be transferred and felt he and his family were threatened. Gunning encouraged defendant to accept a referral into Oschner Clinic's 28 day inpatient program. Defendant stated he would discuss the matter with his wife.
Kent Hungerford, defendant's friend and co-worker, testified that he was a close friend with defendant and socialized with defendant by playing tennis, eating out, and barbecuing together. He saw nothing unusual in defendant's relationship with his wife or children. During the few weeks before June 3, Hungerford was out of town and did not see defendant. They had planned to eat dinner together, just prior to June 3, but defendant called and canceled the outing. Hungerford thought this action was strange. Five months after the murders, defendant called Hungerford and said he was sorry for what he had done. Defendant stated he did not trust anyone, asked Hungerford to tell Sandy Bibb he still loved her, stated he "did it out of love" and wished he could have gone to sleep that night.
Defendant's parents testified about their contact with him the two weeks proceedings the murders. Defendant's father, William Bibb, testified that he saw his son once a year and maintained weekly phone contact. When he spoke with his son on May 25, defendant was depressed and despondent. William Bibb feared for his son's safety and offered to fly down to see him. He also suggested that his son read the 91st Psalm; defendant stated he had read the verses many times. On cross-examination, William Bibb stated that he had not told the police of his May 25 phone conversation with defendant because he was not asked. He did discuss a June 2 phone conversation in which defendant was preoccupied with his children, but seemed better than the week before. He also told the police of a conversation three weeks before the murders in which defendant talked about a transfer.
When Carolyn Bibb, defendant's mother, spoke with him on June 2, defendant stated he was making plans to attend a stress clinic and to come home for vacation in July.
Jefferson Parish Sheriff Harry Lee saw defendant in the emergency room shortly after the murders. Although defendant was alert, Sheriff Lee wanted defendant put in restraints. His impression was that defendant did not fully understand the impact of his actions.
Dr. James Dowling, the surgeon who treated defendant, testified that defendant suffered a potentially fatal injury to his jugular vein in his neck and to the antecubital vein in his arm. If left untreated, both injuries could have caused death. The doctor stated the injuries indicated a serious suicide attempt. During his initial examination, defendant had a flat affect signified by defendant's lack of emotion, withdrawal and non-communicative behavior. However, defendant was coherent and oriented. Dr. Dowling ordered a drug screen; the results only showed a minimal amount of a drug that was a by-product of Dimetapp.
The expert testimony consisted of several psychiatrists and psychologists. Dr. Cecile Many, a psychiatrist, examined defendant at the request of Dr. Dowling. Dr. Many saw defendant for about 1½ hours and tried to determine if defendant was malingering. The doctor diagnosed defendant with major depression with psychotic features. The factors contributing to this diagnosis were defendant's ill physical feelings, lack of good feelings about himself, trouble concentrating, increasing paranoia and flat affect. Dr. Many did not believe defendant was malingering; rather, she believed he had delusions on June 3 and did not know that taking the lives of his children was wrong. Defendant told her that he was laying in bed, was unable to sleep and praying when he was told (by God) to join God in paradise and to bring his family.
Dr. Many's opinion was based solely on her interview with defendant and use of the Diagnostic Statistical Manual III (DSM III); *937 she did not speak with defendant's wife, co-workers or the hospital nursing staff. Because psychotic people can be alert, oriented and responsive, the description of defendant when he was admitted in the emergency room would not change her opinion. Using the DSM III criteria for major depressive episodes, Dr. Many stated how defendant's history indicated factors supporting her diagnosis. On cross-examination, she admitted that a person could be psychotic or have a mental illness and still be able to distinguish between right and wrong.
Dr. John Wakeman, a psychologist and head of the clinic psychology department of psychiatry at Oschner Clinic, conducted psychological testing of defendant. Dr. Gene Usdin, a psychiatrist at Oschner Clinic who was appointed to the sanity commission in defendant's case, ordered the tests. Fourteen tests were administered over five hours; Dr. Wakeman also reviewed defendant's hospital records and conducted a clinical interview. The testing did not indicate defendant was malingering; in fact, in one test defendant attempted to present himself as being healthier than a normal person.
Dr. Wakeman testified that the findings indicated a significant degree of clinical depression and paranoia; the paranoia showed that defendant was extremely vigilant in seeing the world as hostile towards him and that he had exaggerated expectations of what the world and God were able to do for him. Defendant's prior complaints of not trusting people would be consistent with findings of paranoia. The test results further showed a strong religious component to defendant's functioning and that he blurred fantasy of religion with reality.
As to defendant's mental status on June 3, Dr. Wakeman opined that defendant "experienced a brief reactive psychosis and an acute paranoid reaction as a result of gradually developing stressors, real and not real" perceived by him. Further because what was right in his thinking was based upon delusion, defendant did not know the difference between right and wrong. Knowing that defendant was alert and oriented after the murders and that defendant stopped stabbing his wife when she went limp would not change his opinion.
On cross-examination, Dr. Wakeman admitted he did not know, see or talk with defendant prior to the murders or speak with police, defendant's wife, or co-workers in developing his opinion. He further testified that one can be paranoid and distinguish right from wrong. After reviewing the results of psychological tests conducted by Dr. Jepsen, another psychologist, Dr. Wakeman stated he would not change his opinion and disagreed with Dr. Jepsen's opinion that defendant was malingering.
Dr. Richard Roniger, who was qualified as an expert in general psychiatry, saw defendant three times each for an hour or less. The doctor obtained a history from defendant, met with his parents and wife, reviewed defendant's hospital records, psychological tests, statements of other psychiatrists and Dr. Robert Davis' report. He concluded that defendant suffered a brief reactive psychosis, could not tell the difference between right and wrong at the time of the murders, and was not a malingerer. The doctor testified that brief reactive psychosis diagnosis means loss of touch with reality following stress; such psychosis can last a number of hours to a month, and includes delusional behavior. The stressors contributing to this illness can accumulate over time and include death; the person can appear to function well. Contrary to other doctors, Dr. Roniger did not make a diagnosis of major depressive episode or toxic psychosis consisting of a psychotic reaction after taking Dimetapp. Dr. Roniger admitted on cross-examination that people can fake mental illness or a lower IQ, or have delusions and psychosis and still distinguish between right and wrong. He added that a psychosis can be treated by medication and psychotherapy or end on its own. Dr. Aris Cox, a psychiatrist specializing in forensic psychiatry and a member of the sanity commission, also testified at trial. He examined defendant three times totaling almost four hours, talked with Dr. Richoux, reviewed defendant's hospital records, prison medical records, psychological testing, and read Sandra Bibb's statement and defendant's employee records. He opined that at the time *938 of the murders, defendant was psychotic, out of contact with reality because of a psychotic mental illness or defect, and lacked or had impaired ability to distinguish right from wrong. The specific diagnosis was major depression with psychotic and paranoid symptoms. He further concluded that defendant was not malingering.
Although he could not say why someone becomes psychotic, he acknowledged that some psychosis is drug induced. However, the consumption of Dimetapp by defendant did not enter into his evaluation. In the history obtained by Dr. Cox, defendant described auditory hallucinations of being told by God "to join him in Paradise." Dr. Cox believed defendant experienced hallucinations more than once. On cross-examination the doctor admitted that experiencing hallucinations does not prohibit someone from knowing right from wrong and that persons with a higher IQ would find it easier to feign mental illness. He also stated that when interviewed, defendant was aware of what he had done.
Dr. Gene Usdin, a psychiatrist at Oschner, was also a member of the sanity commission. He saw defendant six times totaling 14-15 hours and spoke with defendant's parents. Additionally, he reviewed the following: Sandra Bibb's statement, reports of Drs. Wakeman, Davis, Roniger, Cox and Jepsen, defendant's employer and co-employees, and Oschner Clinic records. Dr. Usdin concluded defendant was not malingering and diagnosed defendant as having a depressive reaction, being in a paranoid state and having an acute psychosis at the time of the murders which prevented him from distinguishing between right and wrong. However, he agreed that persons with paranoia and psychosis can know right from wrong. He further stated that defendant had at least five symptoms of major depression with psychotic features. However, he did not attribute any significance to defendant's digestion of Dimetapp. In discussions with Dr. Usdin, defendant revealed that he did know that he was committing the acts but stated he was doing them for God. Defendant never clearly explained whether he heard God's voice telling him to come to Heaven or if it were a thought.
Dr. James O'Brien, a clinical pharmacologist and toxicologist, was qualified as an expert. His field consists of the practice of medicine in relationship to the affects of drugs. In reviewing defendant's medical records, he discovered the drug screen revealed the presence of phenylpropanolamine (PPA), a decongestant and central stimulant similar to amphetamine in structure, which produces an increase in blood pressure, increased alertness, decreased appetite, and may cause rapid heart beat. PPA is found in 130 different non-prescription cold remedies. Dr. O'Brien added that the effects of PPA in someone of defendant's psychiatric makeup would be an increase in intensity of their psychiatric problems, rather than initiating the problems. Because of his underlying psychiatric condition defendant was more susceptible to the effects of PPA; its ingestion may have precipitated defendant's acute psychotic break. Further, Dr. O'Brien stated he was not surprised that none of the psychiatric reports considered PPA a factor in defendant's behavior and that he did not disagree with those reports.
On cross-examination the doctor admitted that he did not know the quantity of medication that defendant took on June 3 and had no knowledge of a case involving a man with defendant's condition who murdered his wife and children after taking Dimetapp. However, he noted an article in a psychiatric journal which referred to homicidal behavior associated with ingestion of PPA. He further added it would be a rare situation in which a person without underlying psychiatric problems taking medication including PPA would react the same.
Dr. Richard Richoux, the Jefferson Parish Prison psychiatrist and psychiatrist hired by the defense to treat defendant, also testified. He examined defendant a total of 26 times; the first examination was one week after the commission of the offenses. He also reviewed the hospital records, employer's records, and medical records of the other examining physicians. He did not find any signs of malingering. Dr. Richoux opined that defendant suffered from a mental disease in the form of psychotic depression at the time that he killed his children; this disease and psychotic *939 features rendered him incapable of distinguishing right from wrong at the time. His conclusion was based upon the information regarding defendant's evolving depression and evolving paranoia over a period of time. The doctor's opinion about defendant's major depression was based upon defendant's symptoms of depressed mood, sleep disturbance, decreased appetite, decreased self-worth and paranoia. Dr. Richoux admitted that a person could fake depression over a period of time and that it would be easier for an intelligent person to feign mental illness. As to appearances, he stated a psychotic person does not look bizarre, unless he or she is in the midst of a hallucination.
Dr. Richoux also stated that he worked with Dr. Cox on many previous occasions and often they came to the same conclusion. However, in the majority of cases they both agreed that the persons evaluated were sane.
The state presented several rebuttal witnesses. Nurses Peggy Fraught and Theresa Palmisano, who worked in the intensive care unit, testified that while he was a patient, defendant was cooperative and did not ask to see a priest or other religious clergy.
Dr. Michael Jepsen, a psychologist associated with Dr. Robert Davis, was asked to complete a psychological assessment of defendant. He examined defendant for about two and one-half hours, six months after the offenses were committed. Defendant gave an erratic history with information contradicting that given in previous histories. He did not find any evidence that defendant was unable to perceive reality accurately or that he had psychotic processing. On one of the intelligence tests administered, defendant scored in the mentally retarded range. Dr. Jepsen concluded that defendant was trying to present a performance that was less than he was capable of doing. There was no evidence that defendant did not know right from wrong at the time the offenses were committed. Defendant was placed on "suicide watch" in jail, and had attempted suicide. In addition, some of his test results warned of suicide. However, Dr. Jepsen did not believe defendant was suicidal. Rather, he believed defendant was malingering.
Dr. Robert Davis, a psychiatrist who examined defendant for the state, testified that when he examined defendant in December of 1991, defendant was oriented and coherent on the first visit. Defendant had vague memories of the offenses. At the next visit defendant showed more emotion, was sad and talked about his actions in committing the murders. Dr. Davis disagreed with the opinions of other psychiatrists that defendant suffered from major depressive episode and psychotic reaction. Citing defendant's actions of covering his wife's mouth while stabbing her, barricading himself in the bedroom after the murders and resisting handcuffing, Dr. Davis concluded defendant was aware of what he was doing and knew right from wrong at the time of the crimes. On cross-examination, the defense tried to show the doctor's bias from his testimony confirming his daughter-in-law was murdered by a mental patient.
The lay testimony of those persons having contact with defendant prior to the offenses does not appear to either strongly support or contradict the conclusion that defendant was unable to distinguish between right and wrong. Although defendant seemed to be under some stress and his request for a transfer seemed peculiar, the weekend spent with his family prior to the murders was uneventful.
The defense presented several psychiatrists who testified that defendant was unable to distinguish between right and wrong. Dr. Wakeman, a psychologist, based this conclusion only on testing, an interview with defendant and a review of hospital records. He disagreed with the conclusion of Dr. Jepsen, another psychologist, who concluded that defendant was malingering and that he knew right from wrong at the time of the murders. On rebuttal, Dr. Davis testified he disagreed with the other psychiatrists' opinion of a psychotic reaction. He concluded defendant knew what he was doing at the time of the murders and knew the difference between right and wrong.
After reviewing the testimony and considering the totality of the evidence in the light most favorable to the prosecution, we determine that a rational trier of fact could have *940 found that defendant did not prove his insanity by a preponderance of the evidence.
These assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER FIFTEEN
15. The sentences imposed on the defendant are constitutionally cruel, unusual and excessive under both the United States Constitution and the Louisiana Constitution.

DISCUSSION
In this assignment of error, defendant argues that his sentences are excessive. Specifically, he contends that the sentences for the two convictions of first degree murder should not have been imposed to run consecutively. He argues that consecutive imposition of the sentences violates La. C.Cr.P. art. 883, which provides that when crimes arise from a single course of conduct, the sentences should generally run concurrently rather than consecutively.
The state argues that defendant cannot attack his sentences on appeal because he failed to file a motion to reconsider his sentence under La.C.Cr.P. art. 881.1.
Defendant was sentenced on February 14, 1992, which was after February 1, 1992, the effective date of Article 881.1. That article provides:
A. (1) Within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
(2) The motion shall be oral at the time of sentencing or in writing thereafter and shall set forth the specific grounds on which the motion is based.
B. If a motion is made or filed under Paragraph A of this Article, the trial court may resentence the defendant despite the pendency of an appeal or the commencement of execution of the sentence.
C. The trial court may deny a motion to reconsider sentence without a contradictory hearing.
D. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.
Further, in two recent decisions of this court, defendants who failed to file a motion to reconsider sentence were precluded from raising issues regarding their sentences. See State v. Collins, 606 So.2d 585 (La.App. 5th Cir.1992) and State v. Carter, 609 So.2d 261 (La.App. 5th Cir.1992). Nevertheless, the issue will be addressed.
Herein, the two murders, though occurring close in time and place, are separate and distinct acts that justify consecutive sentences. Further, even assuming that the murders were close enough in time and place to be considered "same act" crimes which arise form a single course of conduct, we find that the trial court did not err in imposing consecutive sentences. Article 883 permits the court to impose consecutive sentences if the court "expressly directs" such sentences. State v. Nelson, 467 So.2d 1159, 1161 (La. App. 2nd Cir.1985). Further, in his reasons for sentencing, the trial judge noted that these were "the most heinous crime [sic] I've ever witnessed in my life."
We find that consecutive sentences would not penalize defendant excessively. The crimes were particularly heinous because they involved two young children and because of the manner of killing. See State v. Alford, 521 So.2d 456, 459 (La.App. 4th Cir. 1988); State v. Dennard, 482 So.2d 1067, 1068 (La.App. 3rd Cir.1986).
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVENTEEN
17. The State's systematic and flagrant misconduct in refusing to timely produce requested exculpatory and inculpatory evidence placed defendant at an extreme disadvantage and unconstitutionally deprived defendant of a full and fair trial and due process of law.

*941 DISCUSSION

In assignment of error number seventeen, defendant contends that the state's refusal to timely produce exculpatory and inculpatory evidence denied his right to a fair trial. Defendant cites the state's untimely production of several items as follows:
1. In response to a specific request, the state failed until 6 days before trial to admit that it had possession of exculpatory video tapes seized pursuant to a search warrant of defendant's home.
2. The state failed to admit until January 21, 6 days before trial began, the possession of an oral statement by defendant.
3. The state failed to produce until 5 days after commencement of trial, the statement of defendant's mother indicating she was aware that defendant was suffering from stress prior to the murders.
Additionally, defendant argues that the prosecutor's surreptitious display of the prejudicial book, Fatal Vision, and service of its witness subpoenas by district attorney investigators instead of sheriff deputies, indicate the state's pattern of misconduct. The state counters that in this assignment of error, defendant does not specifically identify the prejudice nor identify all the exculpatory material sought. It further argues that in discovery answers, defendant was informed of his oral statement to the sheriff deputies that he did not wish to talk and that the material sought, including his mother's statement, was not exculpatory material.
The state may not suppress evidence that is favorable to the defendant and material to guilt or punishment when that evidence has been requested by the defendant. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Dill, 461 So.2d 1130, 1139 (La.App. 5th Cir.1984), writ denied, 475 So.2d 1106 (La.1985).
Herein, defendant does not actually allege a Brady violation. Rather, defendant contends that although he received the requested discovery, because this evidence was produced "late", his right to a fair trial and due process was violated.
The state is correct in its assertion that defendant does not show how he was prejudiced. Nor does he specifically identify the content of the video tape or oral statement. Thus, we are unable to determine the affect of the production of these items only a short time prior to trial. As to the statement by Carolyn Bibb, defendant's mother, the trial transcript shows that her testimony included information about her knowledge that defendant was suffering from stress. Defendant had this information and was able to use it at trial. Thus, no prejudice occurred.
This assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBERS EIGHTEEN AND NINETEEN
18. The court erred in refusing to allow the defense the opportunity to show to the potential jurors, during voir dire, the gruesome photographs of the slain children which were ultimately introduced into evidence. The defendant was unable to determine whether the potential jurors were subject to undue prejudice as a result of viewing the gruesome photographs and defendant was prejudiced by this bar in the jury selection process.
19. The court's error in refusing to allow the defense the opportunity to show to the potential jurors, during voir dire, the gruesome photographs of the slain children, which were ultimately introduced into evidence, was prejudicial as it deprived defendant of the opportunity to dilute the prejudice created by the mere showing of the gruesome photographs to the jurors.

DISCUSSION
In assignments of error numbers eighteen and nineteen, defendant contends that the trial court erred in refusing to allow defense counsel the opportunity to show to prospective jurors, during voir dire, the photographs of defendant's slain children, which were later introduced into evidence at trial. Defendant argues that the court's ruling was prejudicial because it deprived him of the "opportunity to dilute the prejudice created by the mere showing of the gruesome photographs to the jurors." Specifically, he contends that the introduction of the photographs *942 during the trial was error. Thus, he argues in his brief, "[T]he only possible solution to cure the prejudice created against defendant would have been to allow the defendant to use these photographs during voir dire to determine whether the potential jurors were so subject to undue prejudice that they could not properly consider the insanity defense offered on defendant's behalf. At the very least, the showing of the gruesome photographs during voir dire may have mitigated the prejudicial effect on the potential jurors and would have caused no prejudice to the state."
The state argues that the trial court properly disallowed exhibiting of photographs to the prospective jurors during voir dire because prospective jurors cannot be questioned about their opinions on evidence.
In our discussion of assignment of error number ten, we determined that the trial court did not err in introducing the photographs at trial and that defendant was not prejudiced by this evidence. Thus, there was no need for defendant to "cure the prejudice created" by the photographs.
Although an accused in Louisiana has the right to full voir dire examination of prospective jurors, La. Const. of 1974, art. I, Section 17, the scope of the examination during voir dire shall be within the discretion of the trial court, La.C.Cr.P. art. 786. However, because the right to full voir dire examination has a constitutional basis, wide latitude should be given the defendant to test prospective jurors' competency and impartiality. Nevertheless, the purpose of voir dire examination is not to elicit jurors' opinions concerning particular evidence to be offered at trial. State v. James, 431 So.2d 399, 403 (La.), cert denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983).
Although we are unclear as to whether or not defense counsel's request actually sought to determine juror's opinions as to the actual evidence presented at trial, we cannot say that the trial court abused its discretion in denying the request. Our review of the record shows that defendant was able to conduct extensive questioning of the prospective jurors so as to intelligently exercise his right to challenge prospective jurors. Thus, these assignments of error lack merit.

ERROR PATENT

ASSIGNMENT OF ERROR NUMBER TWENTY
20. Any and all errors patent on the face of the record.

DISCUSSION
By means of this assignment of error, defendant requests a check for errors patent on the face of the record. This court routinely reviews every criminal appeal for errors patent on the face of the record. A review for patent error was done in accordance with LSA-C.Cr.P. art. 920. State v. Oliveaux, 312 So.2d 337, 339 (La.1975); State v. Williams, 593 So.2d 753, 758 (La.App. 5th Cir.1992).
Such a review reveals that while the minute entry and commitment indicate that defendant was given credit for time served, the transcript does not so reflect. Generally, where there are discrepancies between the minute entry and transcript, the transcript should prevail. State v. Lynch, 441 So.2d 732, 734 (La.1983); State v. Lockett, 542 So.2d 670, 673 (La.App. 5th Cir.1989). According to La.C.Cr.P. art. 880, the court, when it imposes sentence, shall give a defendant credit for time served. Since art. 880 is mandatory in its language, the defendant must be given credit for time served, despite the fact that it is not specifically stated in the transcript.
Our review of the record discloses no errors patent.

CONCLUSION
For the above and foregoing reasons, we conditionally affirm the defendant's convictions and sentences, contingent upon a finding, by the trial court after the evidentiary hearing, that the juror contact occurred after the verdict was rendered or that the contact was not prejudicial, as per discussion in Assignments of Error Numbers Four, Five and Six.
*943 SENTENCES AND CONVICTIONS CONDITIONALLY AFFIRMED; REMANDED TO TRIAL COURT FOR EVIDENTIARY HEARING.
BOWES, J., dissents in part and concurs in part.
BOWES, Judge, dissenting in part and concurring in part.
I respectfully dissent from the decision of my esteemed brothers of the majority to conditionally affirm the guilty verdict of the jury on both counts of first degree murder and all the rulings of the trial judge.
In my opinion, the expert medical testimony and evidence presented by the defense of one pharmacologist and six psychiatrists or psychologists, ALL of whom were extremely well qualified with many, many years of experience in forensic psychiatry and the criminal law field and ALL of whom agreed to the effect that defendant was delusional and/or could not distinguish right from wrong, or was otherwise not responsible for his actions at the time of the killings so as to render him legally insane at that time, is so overwhelming, when compared to the two much less qualified (if at all) experts presented by the state, that it must prevail without a doubt.
Therefore, I find that the state did not prove the defendant guilty beyond a reasonable doubt. I further find that the defendant did prove his insanity at the time of the crime by a preponderance of the evidence as required by LSA-C.Cr.P. art. 652, LSA-R.S. 14:14 and State v. Jackson, 548 So.2d 29, 30 (La.App. 5 Cir.1989) and State v. Claibon, 395 So.2d 770, 772 (La.1981).
I am of the opinion, and am thoroughly convinced, after deep reflection, that the testimony and evidence presented by the defense is so completely convincing, logical, overwhelming and devastating to the state's case that any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could not, repeat not, conclude that the defendant was guilty beyond a reasonable doubt of every element of the crime charged as required by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); and State v. Tassin, 536 So.2d 402 (La.1988); and State v. Scott, 582 So.2d 864 (La.App. 5 Cir.1991).
In assessing the rationality and correctness or fault in the guilty verdict returned I acknowledge that the alleged cold blooded slaughter of one's own small children is so heinous, so horrible, and so repugnant to society, and to any moral person, and to the acceptable standards of human behavior that it cries out for punishment against the perpetrator and no doubt the jury felt this way. However, our American system of criminal justice admonishes us that, no matter how horrible and repugnant the crime is, we must be surebeyond a reasonable doubtthat the defendant is factually, knowingly, and legally guilty and mentally responsible for his actions before he can be found guilty and punished. My analysis has forced my mind and logic to conclude that this is NOT so in the case before us. Bibb was NOT responsible for his grisly actions on the night of June 3, 1993 when he took the lives of his children (and my 28 year record as a conservative judge is well known).
In analyzing the case, I agree with the criteria laid down by the majority in their discussion of assignments of error numbers 11 through 14 and quote from their opinion as follows:
The reviewing court properly looks to the expert and lay testimony and to the defendant's actions. State v. Jackson, 548 So.2d at 31. The factors pertinent to a review of expert testimony are wide-ranging. They include whether lay testimony controverting the expert opinion was offered (State v. Claibon, 395 at 774), whether the experts specifically concluded that the defendant could not discern between right and wrong at the time of the crime (State v. Noble, 425 So.2d 734, 737 (La. 1983); State v. Claibon, 395 So.2d at 774), to what extent the expert testimony was premised on the self-serving revelations of the defendant (State v. Parker, 416 So.2d 545, 551 (La.1982)), to what extent the expert analysis is controverted by other expert analysis (State v. Heath, 447 So.2d 570, 576 (La.App. 1st Cir.), writ denied, 448 So.2d 1302 (La.1984)), the duration of the expert's contact with the defendant and *944 whether he had interviewed the defendant previous to the offense (State v. Guidry, 450 So.2d 50, 52 (La.App. 3d Cir.1984), writ denied, 476 So.2d 344 (La.1985)), the chronological proximity of the expert examination to the offense, and whether the experts were treating physicians. State v. Nealy, 450 So.2d 634, 639 (La.1984). Insofar as the defendant's actions, such factors as whether the defendant fled, disposed of evidence, and deliberately planned and executed the offense are pertinent. State v. Pravata, 522 So.2d at 613-614.
[Emphasis supplied].
In my opinion, a review of the expert medical testimony, discussed in the opinion, using the majority's criteria listed above, belies and refutes the conclusions reached by the majority.
The expert testimony presented by the defense consisted of testimony by six psychiatrists and psychologists, and one expert pharmacologist as follows:
Dr. Cecile Many, a board certified psychiatrist, examined the defendant on June 8, 1991 at St. Jude Hospital five days after the murders. Her "working diagnosis" was major depression with psychotic features; she found Bibb to be "very disturbed psychiatrically." As the majority states, she believed that he had delusions, from his statements to her that God had personally communicated with him (and told him to come join him in Paradiseand to bring his family). In her opinion, Bibb did not know at the time that taking the lives of his children was wrong, and on that morning, Bibb was psychotic.
Dr. John Wakeman, a board certified clinical psychologist, appointed by the court (and therefore an "independent" witness), administered a full battery of psychological tests to Bibb on August 28, 1991. As the majority also concluded, Dr. Wakeman found him to be clinically depressed with a significant degree of paranoia, and fantasy (of religion) that was sometimes blurred with reality. He found the defendant's ties to reality were loose, and that defendant was predisposed to be psychotic. He concluded that on the date of the offense, Bibb experienced a brief reactive psychosis and an acute paranoid reaction as a result of "gradually developing stresses, real and not real, as perceived by Mr. Bibb and that at that time (of the killings) there was [present in Bibb's mind] the inability to know the difference between right and wrong, because what was right in his mind was on the basis of his delusion."
Dr. Richard Roniger, a board certified psychiatrist on the faculty of both Tulane and LSU Medical Schools, examined defendant on three occasions: June 30, 1991, July 17, 1991 and January 10, 1992. He also concluded that Bibb had a brief reactive psychosis, and that at the time of the crime, "his ability to test reality ... was impaired and that he could not tell right from wrong as most of us would distinguish right from wrong." Dr. Roniger found Bibb to be delusional at the time of the killings, with an obsessive compulsive perfectionist personality makeup, and that he "unraveled under stress."
Dr. Aris Cox, a certified forensic psychiatrist, who has served on several hundred lunacy commissions, is also a clinical professor of psychiatry at Tulane Medical School. He first examined Bibb four weeks after the killings. Based on his examination of the defendant as well as his review of the medical records, tests, and interviews with Sandra Bibb (and other witnesses), he opined that Bibb was psychotic at the time of the crime which "... basically means, he was out of touch with reality.... His ability to distinguish right from wrong was impaired or absent." Dr. Cox also found that Bibb was not a malinger.
Dr. Gene Usdin, a board certified psychiatrist and the Senior Psychiatrist at Ochsner Medical Foundation, with many honors in his specialty, examined Bibb on six separate occasions. The initial exam was on June 21, 1991, less than three weeks after the incident. He concluded that Bibb "had a depressive reaction, was in a paranoid state and had acute psychosis [at the time of the murders]." This would have prevented (he felt "strongly") Bibb from distinguishing right from wrong. He also did not find the defendant to be malingering.
Dr. James O'Brien, Director of Poison Control Center at the University of Connecticut, is an expert pharmacologist. He testified *945 that, given Bibb's psychiatric problems, the effects of phenylpropanolamine (PPA), an ingredient in Dimetapp, the medication taken by Bibb earlier on the night of the killings, exacerbated his condition to the point where the defendant had an acute psychotic episodethat PPA upgraded Bibb's pre-existing psychiatric condition to the point of "psychotic break."
Dr. Richard Richoux, a staff psychiatrist at the Feliciana Forensic Facility and prison psychiatrist at the Jefferson Parish Correctional Center, has served on hundreds of sanity commissions. He examined the defendant 26 times beginning one week after the offense and was the "treating physician"  the doctor whose opinion should be given the greatest weight of all. In his opinion, Bibb suffered from "a mental disease in the form of a psychotic depression" at the time he killed the children, which condition rendered him incapable of distinguishing right from wrong at that time. This was based on his "evolving depression and evolving paranoia over a period of time, shortly prior to when this incident took place."
In contrast to this overwhelming evidence by six experts who are substantially in agreement we have only two psychiatrists.
Dr. Michael Jepson, who testified for the state, is a developmental psychologist, not a clinical psychologist and not board certified, whose practice is mainly "general practice." He is chiefly occupied with the testing and therapy of adolescents and children. He did not examine Bibb until six months after the incident, at which time he administered only four tests. Based on these tests, he concluded that, at the time of the murders, Bibb had no thinking disorders, no psychotic processing, and that he was "probably" malingering.
Dr. Robert Davis, board certified in "general psychiatry," also testified for the state. (Dr. Jepson works out of the offices of Dr. Davis so the two opinions cannot be said to be completely independent of each other). He never served on a lunacy commission in his life and did not deal with patients who were charged with crimes. His training background in forensics was limited to several months at East Louisiana State Hospital in 1965almost 30 years ago. Dr. Davis also did not examine Bibb until six months after the crime at which time he talked with him for only two hours and administered no psychological tests. Prior to trial, he admitted telling defense counsel that it was almost impossible to assess Bibb's behavior of six months earlier! Dr. Davis also admitted that his daughter-in-law had been murdered by a mental patient (which could certainly bias his judgment against Bibb). Nevertheless, he testified that, at the time of the killings, Bibb was able to distinguish right from wrong, and that his actions indicated that he was aware of what he was doing. In view of these admissions, I find Dr. Davis' conclusions to be astounding and not worthy of belief.
Thus we see that both Dr. Jepson and Dr. Davis had absolutely NO training or experience in criminal law or with criminal defendants, had never served on a lunacy commission, had experience only in "general" psychiatry and did not see or talk with Bibb until six months after the incident, and then for only a very short time. In addition, Dr. Jepson practiced chiefly with adolescents and childrenand he was not really an expert of any kind since he was not even board certified; also, Dr. Davis did not administer one single psychiatric test.
In summation, it is crystal clear to me that the qualifications, tests, and bases for diagnoses of those six medical expert witnesses who found that Bibb was psychotic or delusional and could not distinguish between right and wrong, or was not in touch with reality, at the time he killed the children, are so far superior to and so outweigh those of the prosecution's so called "experts" so as to render the value and weight of the prosecution's "expert" testimony meaningless and unworthy of belief by any rational trier of fact. In my view, the testimony of these two poorly qualified (and almost completely un qualified) doctors, whose very brief examinations were six months chronologically later, cannot prevail against the overwhelming testimony of the other six (6) well qualified and experienced experts to the contraryand surely no rational trier of fact could be convinced that this pitifully inadequate testimony *946 offered by the state is proof beyond a reasonable doubt.
Moreover, as the treating physician, it is well established that the opinion of Dr. Richoux should have been given much greater weight by the jury. It is apparent to me that my learned brothers of the majority, while citing the correct and applicable criteria, have failed to follow nearly all of it.
In addition, the testimony of the lay witnesses not only does not controvert the expert opinion offered by the defense, but, in my view, strongly supports it as is discussed hereinafter.
There was other exculpatory evidence offered by lay witnesses which indicated the defendant appeared to be under great stress and unusual to his parents (who were close to him and spoke with him often on the telephone). They also thought that he had unnatural and unjustified fears for himself, and his family, and was very "suspicious." He was being audited by his company for the third time which his superior admitted brings on significant stress, and on May 23, about 10 days before the incident, the defendant sent an unusual computer message to his superior, John Goldsby, expressing concern for the safety of his family and himself. Goldsby showed the message to the Division Manager, Doug Carrier, and together they consulted Wally Gunning, the special health services coordinator.
On May 28, Gunning spoke with defendant for 40 minutes and said the defendant was very suspicious, fearing that he and his family were being threatened, and wanted a transfer. Gunning suggested and encouraged the defendant to enter the 28 day inpatient stress program at Ochsner Clinic. Defendant later told his wife he had decided to do this. His father found him depressed and despondent in a telephone conversation about two weeks before the tragedy occurred and in another telephone conversation on June 2, the very day of the killing, his father found he was very preoccupied with his children. On the same day Bibb told his mother he was going to attend a stress clinic and come to visit them in July on vacation. I observed that the majority takes note of all the above in their opinion.
Obviously, then, not only did the defendant not conceive the idea of feigning stress and deliberately planning to go to a stress class as part of a "coverup," but the idea came from the company health officer and he, and Bibb's mother, persuaded him to go.
Also, at first impression, the wounds that Bibb received from his suicide attempt did not appear to be very convincing. However, as pointed out in the majority opinion, Dr. James Dowling at St. Jude Medical Center who saw and treated him for these wounds when he was brought there the same night of the tragedy stated that Bibb had a serious injury to the jugular vein and to the antecubital vein in his arm (cuts), and that both of those wounds were potentially fatal unless treated; and that he was of the opinion that defendant's suicide attempt was a serious one.
In addition to the above evidence negating an intent to knowingly murder, in my opinion, the defendant's killing of his children was completely out of keeping with, and foreign to his personality, and no motive for his actions seems to exist. His superiors at Texaco described him as a good and valued employee who got along well with others and was reserved and quiet. His parents, with whom he was close, stated that on May 25, shortly before the murders, Bibb was depressed and despondent (and not himself usually) and talked about obtaining a transfer back home. His wife described him as almost the perfect husbandgood and attentive to her and the children and as having never abused any of them. On the day of the horrible tragedy the Bibb family spent a happy family day together as any other normal family might do and Bibb took his family to a child's birthday party in the park and played ball with them. Then he bathed them at bedtime.
In my reasoning, and by all the rules of logic and intelligence, these actions and these character descriptions, certainly do not indicate that Bibb was a man who was plotting to knowingly and intentionally murder his entire family. There is nothing that I can find in the recordabsolutely nothingto justify or lend credence to the theory that this man *947 was even capable of knowingly committing these gruesome murders of his own children that, apparently, all previous actions of his indicated he loved dearly. Instead, the character picture drawn of this man suggests that he was absolutely incapable of knowingly committing such a crime and lends great credence to the testimony and expert opinion of the six doctors mentioned above that something snapped in him, mentally and emotionally, and that he was psychotic and undergoing delusions in thinking that God had personally called him and his family to join Him in Paradise. This condition, according to the opinion of six experts who substantially are in agreement rendered Bibb out of touch with reality, incapable of distinguishing right from wrong, and legally insane at the moment he slaughtered his children.
Additionally, the opinions of these six medical experts, all of whose examinations had close chronological proximity to the offense, including Dr. Richoux, the treating physician (see Nealy, supra), was controverted only to a minor extent by the prosecution's two doctors who were not qualified at all in forensic psychology or criminal law and poorly qualified otherwise. While the majority has noted the applicable factors involved in comparing expert opinion, they have, in my view, failed completely to apply them logically and properly to the present case.
Our Supreme Court, in State v. Mussall, 523 So.2d 1305 (La.1988) which involved the same conflicting arguments present in the case at bar, stated as a rule of law:
... that a reviewing court must, on the one hand, give deference to the trier of fact's credibility call, and, on the other, reverse if no rational trier of fact would have found guilt beyond a reasonable doubt based upon the whole record.
[Emphasis supplied].
After reviewing the applicable law and jurisprudence, the Supreme Court in Mussall, affirmed a determination by the appellate court that the evidence at trial was constitutionally in sufficient to support a conviction of guilty. The court further stated:
After reviewing Jackson and the foregoing authorities, we conclude that a reviewing court may not disregard its duty under due process by law as interpreted by Jackson v. Virginia simply because the record contains testimony which "tends" to support each fact necessary to constitute the crime. If the court finds that no rational trier of fact, viewing all of the evidence from a rational pro-prosecution standpoint, could have found guilt beyond a reasonable doubt, the conviction cannot stand constitutionally.

[Emphasis supplied].
While in the present case there was "some" testimony to support some of the elements of the crime, in my opinion, viewing the evidence and the entire record from a rational pro prosecution standpoint, no rational trier of fact could have found that Bibb was legally sane at the time of the murders or that the state had proven, beyond a reasonable doubt, that he was capable of forming, knowingly, a "specific intent" to murderwhich is necessary to support a conviction for first degree murder. By the same test I also find that the defendant proved, by a preponderance of the evidence, that he was legally insane at the time of the killings. Therefore, for these reasons, in my opinion, it was reversible error for the jury to find otherwise.
I am also of the opinion that the learned trial judge (whom, from my knowledge of him is usually very proficient in his job) erred this time in not suspending the proceedings as a result of Bibb's incapacity to proceed at trial. The colloquy cited by the majority opinion clearly evidences that, at the time the defendant's counsel requested a mistrial, the defendant was un able to assist his counsel and should not have been forced to proceedat least not without a recess or continuance. The determination made personally by the trial judge that Bibb "seems" to be aware of the proceedings and the implication that he could "choose" to assist his counsel or not, is directly contradicted by the pleading of defense counsel to the judge that Bibb was not responding, could not stop crying and was incapable of even answering his questions to assist in selection of the jury. *948 At a minimum, the court should have granted the recess requested by defense counsel.
Under LSA-C.C.P. art. 642, once the capacity to proceed has been raised, there "shall" be no further steps in the criminal prosecution until the defendant is found to have the mental capacity to proceed. While the trial court has discretion to make this determination, I believe it was an abuse of discretion to make the finding as he did, by mere visual observation and using his own opinion instead of conducting an inquiry proceeding or at least having a doctor examine Bibb.
While the defendant has the burden of proving his incapacity to continue with the trial, I do not believe he was given the opportunity to do so by the court. I feel that no harm to the state's case could possibly have resulted from the granting of a recess at that point to enable the treating physician/psychiatrist, who was available, to diagnose Bibb's condition and thereafter, determine if he was capable of proceeding. But more importantly, the word "shall" as used in article 642, supra, is mandatory so the judge had no choice. The plain wording of the law required him to "stop the criminal prosecution until the defendant is found to have the mental capacity to proceed." In my opinion, this was a constitutional right due the defendant to give him a fair triala right which he was summarily denied in direct contravention of the express terms of the law.
Finally, I believe it was erroneous to admit the gruesome photographs of the murdered children. The prejudicial effect of this evidence to inflame the jury far outweighed its probative value in a case where the identity of the victims is not at issue, the cause of death has already been established and the defendant has already admitted to the killings.
The refusal to grant a recess under LSA-C.C.P. art. 642, and the admission of the gruesome photographs, are, in my opinion, errors which may well require reversal. However, because I have found that the conviction must be reversed because the state did not prove its case beyond a reasonable doubt, and because the defendant did prove his insanity at the time of commission of the alleged crimes, I do not specifically make a finding as to these last two errors.
However, in the event the majority opinion eventually prevails, then I do concur with that portion of the majority opinion which orders an evidentiary hearing on the issue of juror misconduct, although I dissent from a conditional affirmation.
For the above reasons, I respectfully DISSENT in part and CONCUR in part.